**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|                                             |     |                          |
| ------------------------------------------- | --- | ------------------------ |
| **MICHAEL TODD, *et al.*,**                 |  *  |                          |
|                                             |  *  |                          |
|             **Plaintiffs,**                 |  *  |                          |
|                                             |  *  |                          |
| **v.**                                      |  *  | **Case No.: GJH-15-154** |
|                                             |  *  |                          |
| **XOOM ENERGY MARYLAND,**                   |     |                          |
| **LLC, *et al.*,**                          |  *  |                          |
|                                             |  *  |                          |
|             **Defendants.**                 |  *  |                          |

*  *  *  *  *  *  *  *  *  *  *  *  *

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Michael Todd, Jerome Bonicos, and Elizabeth Donnellon ("Plaintiffs") bring this statutory and common law consumer fraud action against Defendants XOOM Energy, LLC ("XOOM Energy" or "XOOM"), an electricity and natural gas supplier, its Maryland subsidiary XOOM Energy Maryland, LLC ("XOOM Maryland"), and ACN, Inc. ("ACN"), a marketing company that promotes XOOM's services to consumers. Pending before the Court are Defendants' Motion for Summary Judgment, ECF No. 122, and Defendants' Motion to Strike an exhibit to Plaintiffs' Opposition to the Motion for Summary Judgment, ECF No. 134. No hearing is necessary. *See* Loc. R. 105.6 (D. Md.). For the following reasons, the Motion for Summary Judgment will be granted in part and denied in part and the Motion to Strike will be granted in part and denied as moot in part.

I.    **BACKGROUND**[1]

Defendant XOOM Energy "is the parent company of a number of subsidiaries that supply

---

[1] These facts are either undisputed or viewed in the light most favorable to Plaintiffs as the non-moving parties. Additional facts from the record are raised as necessary, construed in the same fashion.

electricity and/or natural gas products in several states and the District of Columbia." ECF No.

122-4 ¶ 4. XOOM operates in states that have deregulated their energy markets, which allows

consumers to purchase energy from entities other than their local utility, although the utility

maintains and operates the physical infrastructure that transports that energy to the consumer's

location. *See id.* at 21.[2] XOOM works with several companies that promote its energy services to

potential customers, including defendant ACN. *Id.* ¶ 31. ACN, which is a trade name of the

entity LKN Communications, Inc., maintains a subsidiary called ACN Opportunity, LLC, which

"administers a program through which independent contractors known as Independent Business

Owners ('IBOs') may promote or refer customers to various products and services." ECF No.

122-5 ¶¶ 2, 5. This includes the energy plans offered by XOOM Energy. *Id.* ¶ 10, 20–21.

ACN stresses that "IBOs are not employees of LKN Communications, ACN Opportunity,

or any other company related to LKN Communications or ACN Opportunity." *Id.* ¶ 6. While

IBOs are not paid a salary or hourly wage by LKN Communications or ACN Opportunity, they

can "earn commissions and bonuses in connection with certain products and services" that they

successfully promote, including XOOM's. *Id.* ¶ 8. ACN Opportunity pays these commissions

and bonuses with funds provided by XOOM. ECF No. 122-4 ¶ 58. In order to become an IBO, a

person or company must "enter into an IBO Agreement with ACN Opportunity" on a website.

ECF No. 122-5 ¶ 11–12. To promote and receive commissions for XOOM services, XOOM

requires IBOs to pass a XOOM accreditation test after reviewing XOOM training materials. *Id.* ¶

23; ECF No. 122-4 ¶¶ 36, 45–48. Some of these training materials direct IBOs not to promote or

promise savings to consumers who switch to XOOM for their energy unless such promises of

savings are stated on XOOM's website. *Id.* ¶¶ 38–41, 60, 63; *see also id.* at 31, 34, 37. Training

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated
by that system.

materials also state that "[c]ustomers must place their own orders" for XOOM's services on its website and "need[] to sign themselves up for service." *Id.* at 31–32; *see also id.* ¶¶ 42–43.

Plaintiffs in this case are New Jersey residents Jerome Bonicos and Michael Todd, (collectively, the "New Jersey Plaintiffs") and Maryland resident Elizabeth Donnellon. At their depositions, each Plaintiff testified that an IBO contacted them promising savings on their monthly energy bills if they switched to XOOM, but that after they were switched their rates instead increased. Plaintiff Bonicos testified that William Stracher, a longtime friend, came to Bonicos's house, said that he was working for XOOM Energy, and could "save [Bonicos] five or ten percent on [his] gas bill" as compared to his local utility. ECF No. 131-10 at 2; *see also id.* at 3–5, 11. Instead, however, Bonicos's rates significantly exceeded what he would have paid to his existing provider. *Id.* at 6–7, 9. Plaintiff Todd testified that a family member – either Lucille DelVecchio or Phil DelVecchio, both of whom were IBOs – called him and said that they "could save [him] significant money by switching over to . . . a third party provider for [his] energy services" and that he would experience "monthly savings." ECF No. 154-4 at 7, 22; *see also id.* at 5, 10, 12, 20, 23–24. The caller then asked him to provide a copy of his existing bill, which he did, after which his energy service was switched. *Id.* at 7–9. Instead of saving money, however, Todd's monthly bills were higher than they had ever been with his local utility. *Id.* at 14–15, 20.[3]

Finally, Plaintiff Donnellon testified that she was visited by her ex-husband's Mark's son, Blaine Donnellon, who said he was a representative of XOOM Energy and told her that she would save money on her electricity bills by switching to XOOM because her rates would be

---

[3] Lucille DelVecchio testified that she spoke with Plaintiff Todd about the work of IBOs and explained that XOOM Energy was one of the services that ACN offers, but did not promise him savings on his electricity bill by switching to XOOM and did not subscribe him to its service. ECF No. 122-9 at 5–8. Phil DelVecchio testified that he never spoke with Todd about his electricity service and had no involvement in his enrollment with XOOM. ECF No. 122-10 at 7–9. The Court considers this evidence, in concert with Plaintiff Todd's testimony, in the light most favorable to Plaintiffs.

lower. ECF No. 122-7 at 5–6; ECF No. 154-3 at 6–7, 9; *see also id.* at 3, 10, 11, 15, 16, 18, 20.
Plaintiff Donnellon then gave Blaine a bill from her existing provider and allowed Blaine and
Mark to use a computer at her house to switch her to XOOM. ECF No. 122-7 at 24–27. Although
Donnellon experienced savings for one month, her bills increased beginning in the second month
of XOOM service. ECF No. 154-3 at 12–13, 23. She eventually resorted to applying for a public
energy assistance program to afford her electric bill. *Id.* at 26.

Plaintiff Todd and a plaintiff who has since left the case filed this action on January 16,
2015 again XOOM, ACN, XOOM Maryland, and XOOM's New Jersey affiliate. ECF No. 1. An
Amended Complaint including the current parties was filed on March 25, 2015. ECF No. 33. The
filing asserted claims under the Maryland Consumer Protection Act, the New Jersey Consumer
Fraud Act, and the North Carolina Unfair & Deceptive Trade Practices Act, and common law
claims of breach of contract, breach of the covenant of good faith and fair dealing, common law
fraud, negligent misrepresentation, and unjust enrichment. *Id.* ¶¶ 37–108. Defendants filed a
Motion to Dismiss the Amended Complaint on April 27, 2015. ECF No. 37. On February 22,
2016, the Court issued a Memorandum Opinion and an Order dismissing without prejudice all
claims except Plaintiff Donnellon's breach of contract claim against XOOM Maryland and the
New Jersey Plaintiffs' negligent misrepresentation claim against ACN. ECF No. 50 at 28–29;
ECF No. 51. Plaintiffs filed a Second Amended Complaint on March 21, 2016 that realleged the
same claims as the first except for the North Carolina statutory claim, breach of the covenant of
good faith and fair dealing, and unjust enrichment. ECF No. 57 ¶¶ 51–101.

Defendants again moved to dismiss on April 20, 2016, ECF No. 59, and the Court
granted the motion in part and denied it in part on February 16, 2017, ECF Nos. 67, 68. The
Court dismissed the breach of contract claims against ACN and XOOM, as well as Plaintiff

Donnellon's negligent misrepresentation claims against all Defendants and the New Jersey Plaintiffs' negligent misrepresentation claims against XOOM Maryland. ECF No. 68. All other claims proceeded. *Id.*; *see also* ECF No. 67 at 21. On June 28, 2019, Defendants moved for summary judgment on all claims. ECF No. 122. Plaintiffs filed their Opposition on July 19, 2019. ECF No. 131. On August 2, 2019, Defendants submitted a Reply, ECF No. 133, and a separate Motion to Strike an exhibit to Plaintiffs' Opposition, the declaration of Frank A. Felder, Ph.D., ECF No. 134. Plaintiffs filed an Opposition to the Motion to Strike on August 15, 2019, ECF No. 137, and Defendants submitted a Reply, ECF No. 144, on August 29, 2019.

The parties also litigated a Motion to Compel that Plaintiffs filed on June 20, 2019. ECF No. 119. The Court referred the Motion to Magistrate Judge Simms on August 16, 2019, ECF No. 138. Following a telephonic hearing on September 4, 2019, ECF No. 145, Judge Simms granted in part and denied in part the Motion, ordering Defendants to produce certain customer complaints that were received between January 1, 2014 and June 30, 2014 and any training materials for responding to such complaints. ECF No. 146. The Court then held a telephone conference on December 5, 2019, during which the Court granted Plaintiffs' request to file a supplemental brief in opposition to summary judgment in light of the newly produced materials as well as Defendants' request to supplement their Motion to Strike. On January 8, 2020, Plaintiffs filed their supplemental Opposition, ECF No. 164, and Defendants filed their supplement to the Motion to Strike, ECF No. 166. The parties filed responses to the supplements on January 31, 2020. ECF Nos. 168 (Plaintiffs' response), 171 (Defendants' response).

Also pending before the Court is Plaintiffs' Amended Motion for Class Certification and Appointment of Class Counsel. ECF No. 161. The Court will consider that Motion separately.

## II.    STANDARD OF REVIEW

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one "that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). The Court may rely on only facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

Federal Rule of Civil Procedure 26(a)(2)(B) provides that unless otherwise stipulated or ordered by the Court, a party offering the testimony of an expert witness must provide a written report, prepared and signed by the witness, that contains, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii); *see Osunde v. Lewis*, 281 F.R.D. 250, 257 (D. Md. 2012). Rule 37(c)(1) imposes sanctions for "fail[ing] to provide information or identify a witness as required by Rule 26(a) or (e)": "the party is not

allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

"[I]n exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). District courts need not expressly consider each *Southern States* factor. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 330 (4th Cir. 2011). Additionally, "Rule 37(c)(1) does not require a finding of bad faith or callous disregard of the discovery rules" in order to impose the sanctions it establishes. *Southern States*, 318 F.3d at 596.

## III. DISCUSSION

### A. Motion to Strike

As described previously, Defendants have moved in their reply to Plaintiffs' Opposition to summary judgment, and in a separate motion, to strike an exhibit to Plaintiffs' Opposition, the Declaration of Frank A. Felder, Ph.D. ECF No. 131-12; ECF No. 133 at 18; ECF No. 134. In their briefing, Defendants establish, and Plaintiffs do not contest, the timeline of Felder's involvement in this case. Plaintiffs served Felder's export report on November 27, 2017, the deadline for making expert disclosures set by the Court after granting two extensions. ECF No. 134-2 at 18. That report offered only two opinions: that Plaintiff Donnellon was charged more by XOOM Maryland than she would have been charged by her local utility, and that Plaintiff

Bonicos was charged more by XOOM's New Jersey subsidiary than his local utility would have charged. *Id.* at 20. Felder reached these conclusions by reviewing Plaintiffs' monthly invoices from XOOM, which showed what they each owed to XOOM as well as the rate that their local utilities would have charged that month for each unit of energy. *See id.*; *see also id.* at 7–8 (explaining this methodology). The report also stated that Felder could repeat his calculations of these "overcharge[s]" if he were "provided similar information for all Plaintiffs." *Id.* at 21.

At his deposition on August 23, 2018, Felder testified that these were the only opinions he had reached in this case. *Id.* at 3–4. Plaintiffs never moved to supplement Felder's report under Rule 26(e). On July 19, 2019, however, Plaintiffs submitted a new Declaration by Felder as an exhibit to their Opposition to summary judgment that contained new opinions not included in Felder's expert report. ECF No. 131-12. The Declaration included conclusions that: "the average XOOM customer paid 42% more for its electricity or natural gas" than their local utility would have charged over the period Felder reviewed; that Maryland customers "paid on average 42% more" than their local utility while New Jersey customers "paid 48% more than the utility price" over that time; that XOOM "did not charge 'the lowest possible cost that the current market allows' for its variable priced customers"; that "there may have been other competitors to XOOM that offered prices even lower than the utilities' prices"; that "[o]ne of the major public policy objectives for the introduction of retail energy competition in electricity and natural gas in the early 2000's was to enable retail customers to lower their utility bills"; and that "[r]etail competition enabled energy providers, such as XOOM, to take advantage of electric and natural gas consumers by failing to deliver on their claims of customer savings." *Id.* ¶¶ 8–10.

None of these opinions were included in Felder's expert report, disclosed at his deposition, or offered at any other point before the Declaration was filed. They were apparently

drawn from a "data set consisting of the monthly variable prices for electricity and natural gas

[XOOM] charged its variable plan customers . . . [that] covered the period of January 2012

through June 2018" and was produced by XOOM "[a]s part of discovery." *Id.* ¶ 7. Plaintiffs'

insertion of these new opinions into the case after submitting Felder's export report undisputedly

violates Rule 26(a)(2)(B), and Plaintiffs' attempt to rely on them to oppose Defendants' Motion

for Summary Judgment violates Rule 37(c)(1) unless their failure to disclose them previously

was "substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). But Plaintiffs' explanation for

their failure to disclose, the fifth of the *Southern States* factors for assessing substantial

justification or harmlessness, is lacking. *See S. States Rack & Fixture*, 318 F.3d at 597. Plaintiffs

claim that they sought the data set that Felder used for the new opinions in a document request

on August 24, 2017 but did not receive it until May 3, 2019. ECF No. 137 at 3 & n.1. That does

not excuse Plaintiffs' actions with respect to the Declaration. Plaintiffs knew they were awaiting

outstanding production at the time Felder produced his expert report on November 27, 2017, but

did not seek a further extension of the deadline. Nor did they move to supplement Felder's report

at any time after receiving the data set, as directed by Rule 26(e).

Plaintiffs offer no explanation for either decision not to act and instead insist that the

other four *Southern States* factors point in their favor. They do not. First, Plaintiffs claim that

Defendants cannot have been surprised by the new opinions because "the results are consistent

with the results of [the] original expert report," in that they show "Plaintiffs consistently paid

higher rates under Xoom's [sic] variable plan than they would if they had purchased their energy

from the public utility." ECF No. 137 at 3. But the conclusions about rates in Felder's

Declaration address not the rates paid by the named Plaintiffs in this case but rather those paid by

XOOM customers across a number of states over a six-year period. The Declaration's

conclusions are plainly different in kind and drawn from a broader set of calculations than the expert report, reasonably giving rise to surprise by Defendants. Plaintiffs' claim that Defendants had notice that Felder might update his opinions because his report stated that "[i]f provided similar information for all Plaintiffs, I can repeat the above overcharge calculations" fails for the same reasons. *Id.* at 4. That argument also does not speak to the other new opinions offered.

Defendants also lacked the ability to cure the surprise at the relevant time. Plaintiffs' argument on this factor relies on the possibility of a second phase of discovery during which Defendants could depose Felder again. *Id.* at 5. While Defendants have now had the opportunity to do so, they had no opportunity to remedy the surprise of the new opinions for purposes of summary judgment, briefing for which was completed before the second deposition. *See* ECF No. 166 at 2–3. Plaintiffs also claim that allowing the Felder Declaration would not disrupt a trial in this case. ECF No. 137 at 6. Whether or not that is true with respect to a trial, Rule 37(c)(1) prohibits a party from using information that it failed to properly disclose under Rule 26 not only "at a hearing, or at a trial" but also "to supply evidence on a motion." That is precisely what Plaintiffs attempt here. If that *Southern States* factor reaches disruption of not only a trial but also the Court's review of a motion, inserting the new opinions at this stage is plainly disruptive for the Court's assessment of Defendants' Motion for Summary Judgment.

Finally, with respect to the importance of the evidence, the new opinions are largely irrelevant to the issues raised in Defendants' Motion for Summary Judgment. The claims at issue in the Motion concern whether the individual named Plaintiffs in this case were promised savings on their monthly energy bills if they switched to XOOM and, if so, whether Defendants may be liable for those promises. Felder's new conclusions with respect to the average rates paid by other XOOM customers have no relevance to the rates paid by the actual Plaintiffs here, nor

does it matter if XOOM "did not charge 'the lowest possible cost that the current market allows' for its variable priced customers" because Plaintiffs do not claim they were promised such a rate. *See* ECF No. 131-12 ¶¶ 8–10. Nor is it relevant that other energy companies may have offered better rates than XOOM or local utilities or that energy deregulation may have allowed XOOM and other providers to fail to deliver on claims of savings. *Id.* ¶ 10.

In their Opposition to the Motion to Strike, Plaintiffs essentially concede the irrelevance of these new opinions to summary judgment by defending their importance on the grounds that they "demonstrate that such overcharges took place on a class-wide basis," and "relate directly to the material issue of whether the variable rates paid by class members were competitive with market rates." ECF No. 137 at 7. Expert opinions that only concern class certification are irrelevant at this stage. Thus, because none of the *Southern States* factors favor Plaintiffs, Plaintiffs' failure to timely provide the new opinions was not substantially justified or harmless. Therefore, pursuant to Rules 26(a)(2)(B) and 37(c)(1), the Court will disregard the Felder Declaration and the testimony it contains in assessing the Motion for Summary Judgment.

To the extent the Motion to Strike seeks to remove the Declaration from the case entirely, however, the Court will deny that request as moot because Plaintiffs have filed an Amended Declaration by Felder in support of their pending Amended Motion for Class Certification. *See* ECF Nos. 161, 162-10. Defendants' supplement to their Motion to Strike focuses on the Amended Declaration and argues on substantive grounds that the Court should strike it or disregard it in considering the certification motion. ECF No. 166 at 3–8. Plaintiffs' response also largely concerns the relevance of the Amended Declaration to certification. ECF No. 168 at 1, 5. For this reason, and because the Amended Declaration was not filed with any summary judgment briefing and is therefore irrelevant to summary judgment, the Court will reserve decision on

Defendants' request to strike the Amended Declaration until the Court considers the certification motion. The Court thus turns now to Defendants' Motion for Summary Judgment.

### B. Exhaustion of Administrative Remedies

In support of summary judgment, Defendants first argue that all of Plaintiff Donnellon's claims must be dismissed because Donnellon failed to exhaust administrative remedies provided by the Public Utilities Article of the Maryland Code. ECF No. 122-1 at 14–15. That Article empowers the Maryland Public Service Commission (the "Commission") to regulate the operations of defined types of energy providers. Under the definitions established by the statute, an "electric company" is "a person who physically transmits or distributes electricity in the State to a retail electric customer." Md. Code Ann., Pub. Util. § 1-101(h)(1). An "electricity supplier" includes "a person . . . who sells . . . electricity," *id.* § 1-101(j)(1); "'electricity supplier' includes an electric company, an aggregator, a broker, and a marketer of electricity," *id.* § 1-101(j)(2). In other words, all electric companies are electricity suppliers, but not all electricity suppliers are electric companies. Finally, a "public service company" is "a common carrier company, electric company, gas company, . . . or any combination of public service companies." *Id.* § 1-101(x)(1).

In *McCoy v. Pepco Holdings, Inc.*, No. GJH-15-2487, 2016 WL 8678000, at *2–*3 (D. Md. June 10, 2016), this Court applied the Maryland Court of Appeals' ruling in *Bell Atlantic of Maryland, Inc. v. Intercom Systems Corp.*, 782 A.2d 791 (Md. 2001), to conclude that the plaintiff's claims had to be dismissed because he had failed to exhaust his administrative remedies under the Public Utilities Article and its implementing regulations. *Bell Atlantic* explained that "[a]lthough the [Commission] only has primary rather than exclusive jurisdiction over consumer complaints, consumers must exhaust their administrative remedies before proceeding with an independent judicial action." 782 A.2d at 805. In other words, "where a

matter involves those areas within the jurisdiction of the [Commission], either in whole or in part, a party may not circumvent the administrative agency's review simply by filing an independent judicial action seeking compensatory and punitive damages." *Id.* at 806.

The court in *Bell Atlantic* also explained that "a consumer first must file a complaint with the [Commission] and then may decide to file an independent judicial action," which the court must stay upon request until the administrative proceeding is resolved. *Id.* at 806–07. Citing provisions of the Code of Maryland Regulations and applying *Bell Atlantic*, the Court in *McCoy* found that the plaintiff's suit against his electric company and its executives "involve[d] issues that [fell] within the Commission's jurisdiction," specifically "issues regarding billing disputes and termination of services." 2016 WL 8678000, at *2–*3. The Court accordingly dismissed the suit because the plaintiff had failed pursue his administrative remedy. *Id.* at *3.

Defendants here claim, relying on *McCoy* and *Bell Atlantic*, that Plaintiff Donnellon's claims must be dismissed because she joined this action without first pursuing administrative remedies against XOOM Maryland. ECF No. 122-1 at 14–15. Plaintiffs respond that *McCoy* does not apply because it involved a "public service company," while XOOM Maryland – as Defendants readily agree – is an "electricity supplier." ECF No. 131 at 15–16; ECF No. 133 at 4. A fair reading of *McCoy* and *Bell Atlantic* makes clear, however, that the exhaustion doctrine applies as long as a plaintiff's claims "involve issues that fall within the Commission's jurisdiction." *McCoy*, 2016 WL 8678000, at *3. Nothing in either case suggests that the category of energy company to which a defendant belongs is relevant.

Further, claims against electricity suppliers for violating consumer protection laws or engaging in fraudulent or deceptive conduct are plainly within the Commission's jurisdiction. § 7-507 of the Public Utilities Article prohibits electricity suppliers from operating in Maryland

without a Commission-issued license and empowers the Commission to revoke or suspend a license for "just cause." Md. Code Ann., Pub. Util. § 7-507(a), (b), (k)(1). "Just cause" for sanctions against an energy supplier – which may be raised "on the Commission's own investigation or on complaint of the Office of People's Counsel, the Attorney General, or an affected party" – may include "committing fraud or engaging in deceptive practices;" and "violating a provision of this article or any other applicable consumer protection law of the State." *Id.* § 7-507(k)(1), (k)(3)(iv), (k)(3)(viii).

Perhaps recognizing that Plaintiff Donnellon's claims against XOOM Maryland fall squarely within this area of Commission jurisdiction, Plaintiffs acknowledge and cite these provisions of the Public Utilities Article and concede that "[t]he Commission clearly has jurisdiction to hear . . . complaints" concerning an electricity supplier's allegedly fraudulent or deceptive conduct. ECF No. 131 at 16–17. Plaintiffs' only response, however, is to claim, without any citation, that this jurisdiction "is not the active and traditional sort of regulation that requires any sort of regulatory expertise that should confer on the Commission primary jurisdiction." *Id.* at 17. While this statement could perhaps be read to suggest that *Bell Atlantic* is distinguishable, it falls short of making out a cognizable legal argument.

The Court concludes that under *McCoy* and *Bell Atlantic*, Plaintiff Donnellon was required to begin her search for redress with the Commission before joining this litigation – but only with respect to her claims against XOOM Maryland. Defendants claim that if exhaustion doctrine applies, *McCoy* permits the Court to dismiss all of Donnellon's claims because the Court there dismissed not only the plaintiff's claims against his electricity provider but also his claims against the other named defendants. ECF No. 122-1 at 15. But the other defendants in *McCoy* were officials of the defendant utility whose actions in their official capacities were

subject to the jurisdiction of the Commission. *See* Complaint, *McCoy v. Pepco Holdings, Inc.*, No. GJH-15-2487 (D. Md. Aug. 21, 2015), ECF No. 1. Because the other Defendants in this case are not so subject, rationales for applying exhaustion doctrine have no bearing. The Court will therefore only dismiss Plaintiff Donnellon's claims against XOOM Maryland on exhaustion grounds.[4] Her claims for violation of the Maryland Consumer Protection Act and common law fraud against XOOM Energy and ACN are considered below along with the claims of Plaintiffs Bonicos and Todd.

### C. Vicarious Liability

Defendants' primary argument in support of summary judgment is that they cannot be held liable for any promises made by the IBOs to Plaintiffs that Plaintiffs would save on their monthly energy bills by switching to XOOM. ECF No. 122-1 at 15–26. Defendants maintain that if such statements were made, they were unauthorized misrepresentations for which Defendants have no vicarious liability. *Id.* Assessing this argument requires examining relevant principles of agency law, which are understood similarly in New Jersey and Maryland.[5] Both jurisdictions

---

[4] The Court notes Defendants' suggestion that Plaintiff Donnellon should have pursued dispute procedures established by the Code of Maryland Regulations. ECF No. 122-1 at 14–15; ECF No. 133 at 4–5. The provisions Defendants cite require a customer to first raise a dispute with a supplier before bringing it to the Commission. ECF No. 122-1 at 14–15 (citing Md. Code Regs. 20.32.01.03A). But as Defendants also recognize, that chapter of the regulations was amended in 2016. *Id.* at 14. While the scoping provision of the chapter previously stated that it applied only to "all electric companies" and "combination gas and electric companies," among providers of other types of energy, the 2016 amendments extended the provision to include "licensed suppliers." *Compare* Md. Code Regs. 20.32.01.01 (2015) *with* Md. Code Regs. 20.32.01.01 (2017) *and* Md. Code Regs. 20.32.01.01 (2019). In other words, Defendants insist that Plaintiff Donnellon should have used a procedure that did not exist when she joined this suit in March 2015. *See* ECF No. 33. Their argument therefore rings hollow. Still, even though the current regulatory structure did not exist when Plaintiff Donnellon entered this action, her claims did fall within the statutory jurisdiction of the Commission – existing at the time she filed – to hear complaints about electricity suppliers. *See* Md. Code Ann., Pub. Util. § 7-507(k)(1) (West 2010). For that reason, she was required to first bring her claims against XOOM Maryland in a complaint to the Commission.

[5] In addition to addressing whether Defendants may be liable for unauthorized statements by the IBOs, Plaintiffs also assert that the promises of monthly savings that the IBOs allegedly made to Plaintiffs here were authorized by Defendants at training sessions and in marketing materials. To support these assertions, Plaintiffs rely significantly on the deposition testimony of a former IBO, Memi Oladapo, who testified that she attended training sessions in Pennsylvania and Maryland where ACN representatives directed attendees to promise savings to prospective customers. ECF No. 131-7 at 4–9, 13, 16–18. Oladapo also testified, however, that she does not know and has connection to any of the Plaintiffs in this case or to any of the IBOs who promoted XOOM services to them. ECF

recognize the baseline principle that "[a]n agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 79 (N.J. 1993); *see Dickerson v. Longoria*, 995 A.2d 721, 735 (Md. 2010). Courts in both states further acknowledge a distinction between two types of agents – sometimes called servants and independent contractors – who are distinguished by "the right of control capable of being exercised by the principal over the agent." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1434–35 (3d Cir. 1994) (describing New Jersey law).

In New Jersey, "[a] servant is a person who is employed to perform personal services for another in his affairs, and who, in respect to his physical movements in the performance of the service, is subject to the other's control or right of control." *Carter v. Reynolds*, 815 A.2d 460, 464 (N.J. 2003) (quoting Restatement (Second) of Agency § 220); *see also Winback*, 42 F.3d at 1435. "If, however, the agent is not subject to that degree of physical control, but is only subject to the general control and direction by the principal, the agent is termed an independent contractor." *Winback*, 42 F.3d at 1435 (citing *Stewart v. Midani*, 525 F. Supp. 843, 845 (N.D. Ga. 1981)); *see also Carter*, 815 A.2d at 464. Maryland law recognizes this same distinction between the two types of agents. *See Brooks v. Euclid Sys. Corp.*, 827 A.2d 887, 904 (Md. App. 2003) (citing *Sanders v. Rowan*, 484 A.2d 1023, 1028 (Md. App. 1984)); *Chevron, U.S.A., Inc. v. Lesch*, 570 A.2d 840, 844 (Md. 1990). Importantly, though the terminology is somewhat confusing, the phrase "independent contractor" is also used to describe contracting parties who

---

No. 133-2 at 7–12. Nor did she or any other witness testify that the IBOs who spoke to Plaintiffs here attended any such training sessions or receive any such materials. Oladapo's testimony thus appears to be irrelevant to Plaintiffs' claims, or at best fails to establish a genuine dispute of material fact on any of the issues raised by Defendants' Motion for Summary Judgment. An additional page of Oladapo's deposition that Plaintiffs provided and cited in their supplemental Opposition to Summary Judgment, ECF No. 164 at 3 (citing ECF No. 164-3 at 2), does not change this conclusion.

are not agents. *See Brooks*, 827 A.2d at 904 (citing *Brady v. Ralph Parsons Co.*, 520 A.2d 717, 730 n.26 (Md. 1987)). As the court in *Winback* explained, "all agents who are not servants are 'independent contractors,'" but "all non-agents who contract to do work for another are also termed 'independent contractors,'" and therefore there are "agent independent contractors and non-agent independent contractors." *Winback*, 42 F.3d at 1435.[6] For clarity, the Court here will use "agent independent contractor" to describe non-servant agents.

To determine the potential for vicarious liability for Defendants here, the Court must examine the relationships that they had with the IBOs when the IBOs promoted XOOM services to Plaintiffs. The Defendant to whom the IBOs had the closest connection was ACN. As Defendants have illustrated with unchallenged evidence, however, named Defendant "ACN, Inc." is a trade name of the entity LKN Communications, Inc. ("LKN"). ECF No. 122-5 ¶¶ 1–2. LKN does not itself administer the IBO Program; it is instead managed by LKN's subsidiary, ACN Opportunity, LLC ("ACN Opportunity"). *Id.* ¶ 5. In fact, IBOs have no contractual relationship with LKN; individuals and corporate entities become IBOs by using a website to enter "IBO Agreements" with ACN Opportunity. *Id.* ¶¶ 5–6, 11–12. The IBOs involved in this case enrolled in the IBO Program in that manner. *Id.* ¶¶ 13–16. Defendants maintain that none of these IBOs were agents of either LKN or ACN Opportunity under either Maryland or New Jersey law, relying in part on explicit and implicit disclaimers of any such agency relationship in their IBO Agreements. ECF No. 122-1 at 19–21, 23–24.

The IBO Agreements indeed deny any such relationship. For example, Blaine Donnellon's IBO Agreement states that a prospective IBO "agree[s] that as an IBO, I am an

---

[6] Some decisions from Maryland courts have simply used the word "agent" to refer to agent independent contractors, which are contrasted with agents who are "servants." *See, e.g.*, *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1051 (Md. 1999).

independent contractor responsible for my own business and not an agent, legal representative or employee of ACN or any carrier, supplier, service provider or other party with whom ACN transacts or contracts business ('ACN Providers'). I acknowledge that my IBO relationship is with ACN Opportunity, LLC and not with any other ACN Company or ACN Provider." ECF No. 122-5 at 15; *see also id.* ¶ 16. The Agreement continues by explaining that the IBO is "free to select my own means, method and manner of operation" and to "choose the hours and locations of my activities under this Agreement," but "shall have no power or authority to bind ACN." *Id.* at 15–16. The IBO also agrees not to "represent[] in any manner that I am an agent, representative, legal representative or employee of ACN, any other ACN Company or any ACN Provider." *Id.* at 16. The IBO Agreements signed by William Stracher and the Del Vecchios are identical except in lacking references to "any other ACN Company." *Id.* at 9–10; *see id.* ¶ 14.

These terms are transparently intended to thwart claims like those of Plaintiffs here by absolving ACN Opportunity and LKN from any vicarious liability for actions of the IBOs. But they are not dispositive of the existence or nonexistence of an agency relationship. "Although the express disclaimer of an agency relationship is highly relevant" in determining whether such a relationship exists, "the Court must also consider the effect of other provisions in [an agreement], as well as other conduct of the parties, to determine the parties' true intent. Otherwise, parties could simply disclaim an agency relationship generally to avoid liability to third parties while agreeing to specific provisions that in fact bind each other to an arrangement that is the equivalent of principal and agent." *Proctor v. Metro. Money Store Corp.*, 579 F. Supp. 2d 724, 737–38 (D. Md. 2008) (applying Maryland law); *see also Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd.*, 858 F. Supp. 2d 402, 418 n.18 (D.N.J. 2012) (applying New Jersey law); *Am. Home Mortg. Corp. v. First Am. Title Ins. Co.*, No. 07–01257 (JLL), 2007 WL 3349320, at *5 (D.N.J. Nov. 9,

2007). This principle is also well established beyond Maryland and New Jersey. *See, e.g.*, *Harper v. Jackson Hewitt, Inc.*, 706 S.E.2d 63, 76–77 (W.V. 2010) (holding that under West Virginia law, "whether a relationship is characterized as agency in an agreement between parties is not necessarily controlling" and "comprehensive factual analysis" is required to determine whether an agency disclaimer is enforceable); *Shamblin v. Obama for Am.*, No. 8:13-cv-2428-T-33TBM, 2015 WL 1754628, at *7 (M.D. Fla. Apr. 17, 2015) (collecting cases).

No such factual analysis is necessary with respect to ACN Opportunity because it is not a party to this case. The question of its vicarious liability for actions of the IBOs is only relevant if LKN, which is named, is responsible for the actions of its subsidiary ACN Opportunity. Plaintiffs present insufficient evidence and no cognizable argument to support such a disregard of the legal separation between parent and subsidiary. In fact, Plaintiffs never acknowledge the existence of ACN Opportunity at all. The only discussion in Plaintiffs' Opposition that relates to Defendants' corporate structure is the conclusory assertion that "XOOM Energy, XOOM State subsidiaries, and ACN act as one interrelated company when it comes to the methods and procedures with which they sold newly deregulated home energy to consumers." ECF No. 131 at 5. Plaintiffs provide no legal authority to substantiate this statement; the only support offered is uncontroverted evidence that the founding CEO of XOOM Energy formerly worked for ACN and that XOOM Energy's state subsidiary LLCs have no employees themselves and are managed by XOOM Energy's leadership. *See id.* That evidence fails to raise a genuine dispute of material fact with respect to the relationship between LKN and ACN Opportunity. The Court need not inquire further on this specific issue.

The Court will address, however, the separate but distinct question whether the IBOs could be agents of LKN, independent of any subsidiary-to-parent pass-through liability. In other

words, it is conceivable that an individual in a contractual relationship with a subsidiary could nonetheless be an agent of the subsidiary's parent if direct interactions between the parent and the individual display features of an agency relationship. Under Maryland law, "three characteristics [have] particular relevance to the determination of the existence of a principal-agent relationship: (1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent." *Green*, 735 A.2d at 1048.

That the principal is the actual signer of contracts that the agent has promoted or negotiated does not negate the first characteristic, and the principal only has to control "the result or ultimate objectives of the agency relationship"; "[t]he level of control may be very attenuated with respect to the details." *Id* at 1050–51. Further, these three factors are "neither exclusive nor conclusive considerations in determining the existence of an agency relationship" and should "be viewed within the context of the entire circumstances of the transaction or relations." *Id.* at 1049. New Jersey law takes a similarly broad approach. While the agency relationship is characterized by control and direction of the agent's acts by the principal, "direct control of principal over agent is not absolutely necessary." *Sears Mortg. Corp.*, 634 A.2d at 80. "[A] court must examine the totality of the circumstances to determine whether an agency relationship existed even though the principal did not have direct control over the agent." *Id.* (citing 2 C.J.S. *Agency* § 36 (1972)).

In their arguments on this subject, Plaintiffs assert that "Defendants exercised strict and substantial control over the promotion and marketing activities of the ACN IBOs" and that "IBOs had actual authority from Defendants to promote and market Xoom energy [sic] supply services." ECF No. 131 at 18–19. The evidence that Plaintiffs cite speaks in significant part to

the control that XOOM entities purportedly have over IBOs, which the Court addresses below. With respect to ACN entities, Plaintiffs primarily cite passages from "ACN's Policies and Procedures handbook," which sets out a variety of rules, responsibilities, and restrictions for the conduct of IBOs "intended to 'ensure proper functioning of daily business operations.'" *Id.* at 19 (quoting ECF No. 131-14 at 5).

For example, the handbook states that "ACN strictly prohibits [IBOs] from engaging in certain types of 'cold marketing' techniques' for purposes of customer acquisition at any time." *Id.* at 7. IBOs may only market services to persons the IBO personally knows, other acquaintances, and customer referrals, a practice known as "warm marketing." *Id.* at 8, 11. IBOs promoting energy services are also prohibited from creating their own marketing materials and must use those provided by ACN. *Id.* at 11. Another provision of the handbook states that IBOs "may only offer and sell services and products in accordance with rates, terms and conditions established by ACN, any regulatory agency or its carrier/supplier/service provider(s)." *Id.* at 8. Additionally, "ACN and its carrier/supplier/service provider(s) have the sole right to accept or reject orders for products and services." *Id.* In the event of a "customer dispute," IBOs "must cooperate fully with ACN's Compliance Department." *Id.* Finally, "[a]ny [IBO] who violates any provision of the [IBO Agreement], which includes all Policies and Procedures itemized herein, may be terminated by ACN." *Id.* at 5.

These restrictions provide ample evidence that ACN has "ultimate responsibility to control the end result of [the IBOs'] actions," even though the "level of control" is somewhat "attenuated with respect to the details." *Green*, 735 A.2d at 1051. In their "daily business operations," IBOs may only sell the services that ACN makes available and in the manner that ACN prescribes, may use only ACN marketing materials, may not address customer complaints

themselves, and may be terminated for failure to adhere to these and other specific restrictions. ECF No. 131-14 at 5, 7, 8, 11. While these provisions of the ACN handbook do not provide definitive proof of an agency relationship, they raise enough of an issue of material fact to defeat summary judgment on the question under both Maryland and New Jersey law. *See Green*, 735 A.2d at 1048 ("When legally sufficient evidence is produced of an agency relationship, the question of the existence of the agency relationship is a factual matter and must be submitted to the jury."); *Mangual v. Berezinsky*, 53 A.3d 664, 669–70 (N.J. Super. Ct. App. Div. 2012) (holding that summary judgment is inappropriate when a "rational jury could go either way" on the existence of an agency relationship).

Of course, were the handbook a set of policies and procedures imposed solely by ACN Opportunity on its IBOs, rather than by LKN, it would be irrelevant to this case because ACN Opportunity is not a party. But the handbook's introduction section states that "[f]or purposes of these Policies and Procedures, ACN Opportunity, LLC its parent, subsidiaries and affiliates shall be referred to as 'ACN.'" ECF No. 131-14 at 5.[7] Additionally, in a "Glossary of Terms" section, the term "Company," which is used occasionally in the body of the handbook, is defined as "ACN Opportunity, LLC and its affiliated entities." *Id.* at 17.[8] These definitional statements create a significant amount of ambiguity about the meaning of the handbook's various restrictions and rules for IBOs, which refer only to the IBOs' responsibilities to "ACN."

One reasonable resolution of this ambiguity is the conclusion that not only ACN Opportunity, but also its parent, LKN, exercise control over the IBOs to a degree sufficient to establish an agency relationship. To be clear, the provisions from the handbook, the chief

---

[7] The absence of a comma following "LLC" reflects how this text appears in the document.
[8] Black's Law Dictionary defines "affiliate" to include "parent" corporations as well as "subsidiary" and "sibling" corporations of the entity with which they are affiliated. *Affiliate*, Black's Law Dictionary (11th ed. 2019); *see Structural Pres. Sys., LLC v. Andrews*, 931 F. Supp. 2d 667, 672–73 (D. Md. 2013) (applying this definition).

materials on which Plaintiff relies, are not definitive proof that the IBOs are agents of LKN. But the rules and restrictions that the handbook imposes on IBOs – and the lack of clarity as to which ACN entity is imposing them – are legally sufficient evidence of an agency relationship between LKN and the IBOs for a reasonable factfinder to reach that conclusion. *See Green*, 735 A.2d at 1048. The Court will therefore decline to grant summary judgment on the ground that the IBOs were not agents of the ACN entity that Plaintiffs have named as a Defendant.

The Court can conclude, however, that the IBOs were not servants of LKN. In Maryland, "[o]ne may be an agent of another . . . but at the same time not be sufficiently under the control of the principal to be considered a servant." *Green*, 735 A.2d at 1051 (quoting *Chevron, U.S.A.*, 570 A.2d at 844). "A servant is a person who is employed to perform personal services for another in his affairs, and who, in respect to his physical movements in the performance of the service, is subject to the other's control or right of control." *Id.* at 1050–51 (quoting *Globe Indem. Co. v. Victill Corp.*, 119 A.2d 423, 427 (Md. 1956)). "The decisive test in determining whether the relation of master and servant exists is whether the employer has the right to control and direct the servant in the performance of his work and in the manner in which the work is to be done." *Id.* (quoting *Chevron, U.S.A.*, 570 A.2d at 844). "[O]nly when the level of control is sufficiently high does a principal become a master and an agent a servant." *Id.* at 1051 (using "principal" and "agent" to refer to the parties in a non-servant agency relationship).

New Jersey defines servant similarly as "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." *Carter*, 815 A.2d at 464 (quoting Restatement (Second) of Agency § 220). New Jersey courts consider several factors in "determining whether one acting for another is a servant or an independent contractor," including

"the extent of control which, by the agreement, the master may exercise over the details of the work," "the method of payment, whether by the time or by the job," and "whether or not the parties believe they are creating the relation of master and servant." *Id.* (quoting Restatement (Second) of Agency § 220). The Court need not engage in a rigorous factual analysis to determine that the IBOs here are not servants of LKN under either state's law. Uncontroverted evidence makes clear that the IBOs are not employed by LKN, LKN does not control their physical conduct, the IBOs are paid on a commission basis, and the IBO Agreements specifically disclaim an agency relationship. Little if any evidence suggests that LKN's degree of control over the IBOs rises to the level sufficient to render them servants. The sole question for the factfinder with respect to the relationship between the IBOs and LKN, therefore, is whether IBOs are agent independent contractors of LKN.

The Court now turns to the application of these principles to the non-ACN Defendants. An initial note is necessary with respect to XOOM Maryland. As Defendants' brief correctly suggests, the Second Amended Complaint is unclear as to whether the New Jersey Plaintiffs assert claims against XOOM Maryland. ECF No. 122-1 at 32–33. Plaintiffs' Opposition maintains that ambiguity by referring to Defendants as a unitary entity when discussing the New Jersey Plaintiffs' claims. ECF No. 131 at 26–27. The Court has already dismissed the New Jersey Plaintiffs' negligent misrepresentation claim against XOOM Maryland, ECF No. 68, but to the extent that they assert other claims against XOOM Maryland, the Court will grant summary judgment for Defendants. There is no evidence in the record of any connection between XOOM Maryland and the New Jersey Plaintiffs, nor any evidence that they were injured by any actions or omissions by XOOM Maryland. Summary judgment is therefore appropriate. That conclusion also leads to another. Because the Court already found that Plaintiff

Donnellon's claims against XOOM Maryland must be dismissed for failure to exhaust administrative remedies, no claims against XOOM Maryland survive, and XOOM Energy and ACN are the only remaining parties to the action. Thus, having already addressed ACN's vicarious liability, the Court need only consider whether XOOM Energy may be held vicariously liable for the actions of the IBOs.

The IBOs' relationship with XOOM Energy is in some ways more attenuated than their connection to ACN, but a reasonable jury could find that the IBOs are XOOM's agent independent contractors as well. As Plaintiffs observe, ample evidence describes the significant degree of control that XOOM has over the IBOs' marketing of XOOM services. ECF No. 131 at 18–19. In a declaration, Patricia Kulesa, Compliance Manager of XOOM Energy, LLC, describes in significant detail the degree of oversight and control that XOOM has over the IBOs, whom she describes as "people and companies who promote XOOM Energy plans" and "people and companies which ACN has made available to promote XOOM Energy subsidiaries' plans." ECF No. 122-4 ¶¶ 31–32.

First, in order "[t]o complete the XOOM Energy training, an IBO must review training materials prepared by XOOM Energy" that describe the energy industry and XOOM's service offerings and "discuss how the plans should be promoted to customers." *Id.* ¶ 36. Kulesa further states that "XOOM Energy has created written training materials that are shown to IBOs through an ACN-related website and at certain training events." *Id.* ¶ 37. "The materials include PowerPoint presentations and a set of slides accompanied by a narration read by a XOOM Energy employee." *Id.* Additionally, "XOOM Energy has always required that, once an IBO has reviewed the training materials, she must complete and pass an on-line accreditation test that re-emphasizes important points from the training and consists of a series of multiple-choice and

true/false questions about XOOM Energy." *Id.* ¶ 45. "XOOM Energy maintains records of the dates on which IBOs have passed their accreditation tests." *Id.* ¶ 52. Once IBOs are accredited, XOOM Energy makes available "flyers that advertise introductory or promotional rates" for XOOM Energy services. *Id.* ¶ 62.

This testimony shows that XOOM is extensively involved in training IBOs to promote its services. Though IBOs are "made available" by ACN, *id.* ¶ 32, XOOM Energy requires the IBOs to review training materials that XOOM Energy creates to instruct the IBOs on how to promote XOOM plans to customers. *Id.* ¶¶ 36–37. While Kulesa does not explain which entity authors the test questions, review of the questions themselves shows that they include several questions about the details of XOOM Energy's operations and service offerings. *See id.* at 36–40. Tellingly, it is XOOM Energy, not ACN Opportunity or LKN, that maintains records of accreditation tests taken and passed. *Id.* ¶ 52. XOOM also prepares physical marketing materials for IBOs to promote its services. *Id.* ¶ 62. Finally, Kulesa states that "XOOM Energy may suspend or terminate an IBO's accreditation if an IBO misrepresents XOOM Energy subsidiaries' plans or disregards other requirements for marketing those plans." *Id.* ¶ 65. In short, Kulesa's declaration demonstrates that IBOs are trained with XOOM-created materials to promote XOOM services, required by XOOM to show their mastery of those materials on an accreditation test, provided with flyers to assist in marketing XOOM services once accredited, and are subject to suspension or termination of that accreditation by XOOM if they fail to promote its services in the manner XOOM directs.

As with LKN, this evidence cannot demonstrate under either Maryland or New Jersey law that the IBOs are servants of XOOM Energy. But it is sufficient for a reasonable jury to conclude that the IBOs are XOOM Energy's agent independent contractors. As with ACN, there

is ample evidence that XOOM has "ultimate responsibility to control the end result of [the IBOs'] actions," which it "exercise[s] by prescribing the [IBOs'] obligations or duties before or after the [IBOs] act[], or both." *Green*, 735 A.2d at 1051. The IBOs plainly have a "duty to act primarily for the benefit" of XOOM in marketing its services. *Id.* at 1048. That XOOM, rather than the IBOs themselves, enters agreements with the customers that the IBOs locate does not "negate[]" an agency relationship "[w]hen the facts otherwise demonstrate" that one exists. *Id.* at 1052. The same result is compelled under New Jersey's "totality of the circumstances" approach to purported agency relationships that lack "direct control of principal over agent." *Sears Mortg. Corp.*, 634 A.2d at 80. The record indicates that XOOM "consent[ed] to have [the IBOs] act on its behalf, with [XOOM] controlling and directing the acts of [the IBOs]." *Id.* Considering the parties' "conduct" and "factual relation," there is sufficient evidence for a reasonable factfinder to conclude that the IBOs were agent independent contractors of XOOM Energy. *Id.* (quoting *Henningsen v. Bloomfield Motors*, 161 A.2d 69, 78 (N.J. 1960)).

Defendants challenge this conclusion under Maryland law by relying on the Maryland Court of Special Appeals' decision in *Brooks v. Euclid Systems Corp*. In that case, an investor who lost his retirement savings sued his investment and financial advisor Keating, Keating's employer Delta, and issuers of securities in which Keating invested Brooks' retirement savings after mispresenting their nature and suitability. 827 A.2d at 890. On Brooks' appeal of the trial court's grant of summary judgment for the issuers, the Court of Special Appeals held that Keating was not an agent of Euclid, one of the issuers. *Id.* at 891. The only control Euclid had over Keating and Delta was through the terms of a "Selling Agreement" that "did not give Euclid the right to select, supervise, discipline, or train the individual registered representatives who worked for Delta. Thus, Euclid had no right to control Keating or other Delta employees." *Id.* at

899. While Brooks cited terms from the Selling Agreement that prohibited Delta from using written materials that Euclid had not approved, among other restrictions, the court determined that they were "patently designed to preserve and protect" Euclid's exemption from certain securities regulations and "to ensure compliance with anti-fraud principles applicable to [Euclid's] offering," rather than to generally control Delta or Keating's actions. *Id.* at 900.

*Brooks* is distinct from this case because the record reflects that XOOM had a much closer relationship with the IBOs than Euclid did with Keating. Euclid was simply an issuer of securities that placed some limits on how those securities could be marketed. *Brooks* does not suggest that Euclid had any interaction with Keating, and Euclid's agreement with Delta "did not give Euclid the right to select, supervise, discipline, or train" Delta's salespeople. *Id.* at 899. Here, as the Court described previously, XOOM played a substantial role in each of those tasks by creating and administering training materials and accreditation tests for IBOs, providing the physical materials they could use, and retaining the power to terminate them for failing to adhere to XOOM policies. This level of direct involvement far exceeds the degree to which Euclid controlled Keating in *Brooks*. As the court there explained, "[a] principal's right to control its agent is of paramount importance, but that control may be exercised in myriad ways." *Id.* at 898 (citing *Schear v. Motel Mgmt. Corp. of Am.*, 487 A.2d 1240, 1248 (Md. App. 1985)). A reasonable jury could find that XOOM Energy had and exercised the right to control the IBOs as its agent independent contractors here. Summary judgment on the ground that actions of the IBOs cannot be imputed to XOOM is therefore inappropriate.[9]

---

[9] Defendants also raise *Brooks* to challenge the existence of an agency relationship between the IBOs and ACN. ECF No. 122-1 at 23–24. This argument is unpersuasive because ACN – as the entity whose subsidiary had the contractual relationship with the IBOs – is essentially in the position that Keating's employer Delta occupied in *Brooks*, rather than in the position of Euclid, which is occupied here by XOOM. Because the court's reasoning in *Brooks* is focused on analyzing the specific, attenuated relationship between Euclid and Keating, its analysis is largely uninstructive in assessing the relationship between ACN and the IBOs.

Having concluded that the IBOs could reasonably be treated as agent independent contractors of both XOOM Energy and ACN, but not their servants, the Court turns to the impact of that relationship on the Defendants' liability for the IBOs' alleged misrepresentations about savings on energy bills. Under both Maryland and New Jersey law, the nature of an agency relationship governs the degree of vicarious liability that a principal has for the acts of the agent. If the agent is a servant, "the fault of the agent, if acting within the scope of his employment, will be imputed to the principal by reason of respondeat superior." *Winback*, 42 F.3d at 1435 (quoting *Baldasarre v. Butler*, 625 A.2d 458, 464 (N.J. 1993)). "On the other hand, 'the principal [generally] is not vicariously liable for the torts of the *independent contractor* if the principal did not direct or participate in them.'" *Id.* (alteration in original) (quoting *Baldasarre*, 625 A.2d at 465); *accord Sanders*, 484 A.2d at 1028–29.

There are exceptions to this general rule, however. "There is a range of tortious conduct on the part of an agent that may bind the principal and subject him to liability even where the agent is *not* a servant, where the act was *not* done in the manner authorized or directed by the principal, and where the result was *not* authorized or intended by the principal." *Sanders*, 484 A.2d at 1029 (emphases in original). "A principal is not generally liable for physical torts committed by its independent contractor-agent, but a principal *will* be held liable for the independent contractor-agent's misrepresentations 'upon matters which the principal might reasonably expect would be the subject of representations, provided the other party has no notice that the representations are unauthorized.'" *Winback*, 42 F.3d at 1437 (quoting *Sanders*, 484 A.2d at 1029)); *see also Brooks*, 827 A.2d at 903 (citing the same language, which derives from the Restatement (Second) of Agency § 258); *Gennari v. Weichert Co. Realtors*, 672 A.2d 1190, 1212 (N.J. Super. Ct. App. Div. 1996) (quoting the same language from § 258); *Dymburt v. Rao*,

881 F. Supp. 942, 945 (D.N.J. 1995) (citing *Sanders*, 484 A.2d at 1029)).[10]

As the Third Circuit cogently explained in *Winback*, the basis for this exception to the general rule against vicarious liability for an agent independent contractor's torts is "the injustice in allowing a principal to place agents in the marketplace, to allow the agents to complete contracts on the principal's behalf, to profit from the agents' misrepresentations, and then to disclaim liability for the agents' actions while benefitting from the fraud." 42 F.3d at 1438. Such an arrangement is precisely what the Plaintiffs have alleged in this case, and evidence they have gathered supports the application of the exception here. According to Plaintiffs' testimony, IBOs represented to each of them that switching from their local utility to XOOM would reduce their monthly energy bills.

Specifically, Plaintiff Bonicos testified that Stracher told him he could "save [Bonicos] five or ten percent on [his] gas bill." ECF No. 131-10 at 2; *see also id.* at 3, 4, 5, 11. Plaintiff Todd testified that the IBO who contacted him said "they were working with a company that could save [Todd] significant money by switching over." ECF No. 154-4 at 5; *see also id.* at 7 (testifying that the IBO said they could "save [him] significant money by switching over to . . . a third party provider for [his] energy services"); *id.* at 10, 20, 22, 23. While Defendants make much of variations in Plaintiff Donnellon's testimony about what an IBO told her, the thrust of her descriptions is the same: the IBO said that she would save money on her electricity bills by

---

[10] Plaintiffs separately argue that Defendants may be liable under one or more exceptions to the general rule against vicarious liability for torts of independent contractors. ECF No. 131 at 23–26. This argument draws on case law from Maryland and New Jersey courts that in turn draws from a chapter of the Restatement (Second) of Torts concerning employers' liability for their independent contractors' torts. *See Appiah v. Hall*, 7 A.3d 536, 551–52 (Md. 2010); *Schreiber v. Camm*, 848 F. Supp. 1170, 1175 (D.N.J. 1994). Review of § 409, a section of that chapter of the Restatement (Second) of Torts titled "General Principle," makes clear that when referring to "independent contractors," that Restatement does not distinguish between agent and non-agent independent contractors. *See* Restatement (Second) of Torts § 409 cmt. a (citing Restatement (Second) of Agency § 2 cmt. b). The doctrine that courts have derived from these provisions thus sweeps more broadly than the scope of this case. Because applying this framework would therefore add unnecessary complication, and because the Court ultimately agrees with Plaintiffs on this issue, there is no need to consider this alternative theory further.

switching to XOOM Energy because her rate would be lower. *See* ECF No. 154-3 at 3, 6, 7, 9, 10, 11, 15, 16, 18, 20.

Whether ACN or XOOM can be held vicariously liable for the torts committed by the IBOs turns on the factors stated in Section 258 of the Restatement (Second) of Agency and applied in *Winback*, *Sanders*, *Brooks*, and other Maryland and New Jersey case law. Section 258 explains that a principal is subject to liability when its agent makes "tortious misrepresentations . . . upon matters which the principal might reasonably expect would be the subject of representations, provided the other party has no notice that the representations are unauthorized." Restatement (Second) of Agency § 258. The provision thus establishes three elements that must be met for a principal to be liable: (1) the misrepresentations must be tortious; (2) they must concern matters about which the principal might reasonably expect the agent to make representations; and (3) the other party must have no notice that the agent lacks authority to make the representations. A comment clarifies this third factor, explaining that the statements must concern "such matters as the other party to the transaction may reasonably believe have been confided to the agent to deal with." *Id.* cmt. a. An illustrative example explains that a potential buyer of a horse may reasonably believe that an agent tasked by the horse's owner with selling it has authority "to describe the horse, its age, and other similar matters." *Id.* Importantly, "the fact that the principal has instructed the agent to make no statements about the horse does not relieve him from liability for fraudulent misstatements of the agent." *Id.*

The second and third elements set out in Section 258 are satisfied here. First, a reasonable jury could find that Defendants could reasonably expect IBOs to make statements about the cost savings that switching to XOOM would produce for Plaintiffs. According to the ACN handbook, IBOs were paid for their work based on the number of customers they acquired. *See* ECF No.

131-14 at 13–14. The IBOs deposed in this case testified that they generally understood that they would be paid in this manner. *See* ECF No. 154 at 16 (testimony of Stracher that he understood that he would get a commission for every sale he made); ECF No. 122-10 at 5 (testimony of Phil DelVecchio that he would receive checks for a portion of the services for which he enrolled customers). With a compensation structure that rewards enrolling more customers, the inference can reasonably be drawn that IBOs had an incentive to enroll as many customers as possible by making statements about the savings customers would enjoy. Defendants, therefore, could reasonably expect the IBOs to make such statements about savings.[11]

Defendants forcefully deny that such an expectation would be reasonable by pointing to evidence that IBOs are specifically trained not to guarantee savings to potential customers. ECF No. 122-1 at 8–9, 16; ECF No. 133 at 9. Such warnings are apparent both in XOOM training materials attached to the Kulesa Declaration and in passages in the ACN handbook. *See* ECF No. 122-4 ¶¶ 38–41, 60; *id.* at 31 (XOOM training presentation stating "Don't promote savings. XOOM Energy does not guarantee savings."); *id.* at 34 (XOOM training presentation slide stating "there is no way to guarantee that our rate will always be below the utility or that the customer will save money over a certain period of time" and that "you never guarantee savings unless savings are stated on the XOOM Energy website"); ECF No. 131-14 at 12 (ACN handbook passage stating that IBOs "may not make any references to specific or numerical savings guarantees, whether expressed or implied, with respect to ACN's services").

Nonetheless, Defendants' argument is unpersuasive. First, the same section of the ACN handbook that directs IBOs not to promise "specific or numerical savings guarantees," which is

---

[11] Because the Court makes this conclusion in Plaintiffs' favor on the existing record, the Court need not consider the relevance or impact of complaints from other customers that Plaintiffs have offered with their supplement in opposition to summary judgment, ECF No. 164 at 2–4, nor the significant hearsay issues with those materials that Defendants have raised in response, ECF No. 171 at 3–5, 8.

titled "Customer Rate Guarantees or Service Savings," nonetheless states that it is "acceptable" for IBOs to say that "[c]ustomers will receive the same or better pricing by switching to ACN." ECF No. 131-14 at 12. The plain meaning of that passage is that ACN is authorizing IBOs to promise potential customers that they will pay, at most, the same as their current rate, and could pay less. That statement is sufficient to raise a dispute of material fact with respect to what ACN authorized IBOs to pledge to customers, if not XOOM Energy as well.

Second, there is some ambiguity in the record as to whether the IBOs whose alleged statements are at issue were shown these training materials. Stracher testified that he might have taken a "questions and answers" course at an unidentified person's apartment but did not receive any kind of certification afterwards, did not think he had received any written materials from ACN, and had received no written materials from XOOM Energy. ECF No. 154 at 11, 15. Nor had he seen any ACN "policies and procedures." *Id.* at 14. He believed, however, based on state-by-state pricing information he obtained from a website, that his customers would pay a lower rate than they were currently paying, including Plaintiff Bonicos, whose testimony supports Stracher's account of his beliefs and statements about savings. *See id.* at 13, 17; ECF No. 131-10 at 2. While the parties have not provided testimony from Blaine Donnellon or the DelVecchios that speaks to their training as IBOs, the testimony of Plaintiffs Todd and Donnellon reflect that the IBOs they spoke with made similar statements about savings, as discussed previously. ECF No. 154-4 at 5, 7, 10, 20, 22, 23; ECF No. 154-3 at 3, 6, 7, 9, 10, 11, 15, 16, 18, 20. Determining the credibility of this testimony is a matter for a factfinder.

Finally, even if the IBOs did receive the training materials instructing them not to promise savings, Section 258 of the Restatement makes clear that such warnings are largely irrelevant. As the Restatement's example describing a horse sale makes plain, the fact that a

principal instructs an agent not to make statements that the agent nonetheless makes "does not relieve him from liability for fraudulent misstatements of the agent." Restatement (Second) of Agency § 258 cmt. a.[12] Applying this principle and the remaining factors of the doctrine here, even if ACN and XOOM instructed the IBOs not to make promises about savings on electricity, that does not relieve them of vicarious liability for tortious misstatements that the IBOs made if Plaintiffs had no notice that those representations were unauthorized. And there is no indication in the record that Plaintiffs had such notice here. Instead, a reasonable jury could find that Plaintiffs had no notice that the IBO's promises of savings were unauthorized and reasonably believed that the IBOs were permitted to make them.

Indeed, Plaintiff Bonicos testified that he was "taking the word of Mr. Stracher" that Stracher was "working for XOOM Energy" and that he could reduce his gas bill by switching his service. ECF No. 131-10 at 2, 4. There is no suggestion that he knew Stracher was not authorized to promise savings. The testimony of Plaintiffs Todd and Donnellon is similar. Plaintiff Todd testified that he assumed that the DelVecchios worked for XOOM Energy because "they were selling their product" and further assumed that "somebody instructed" them "to say what they said" about their "ability to save [him] significant money on [his] electric bill." ECF No. 154-4 at 10; *see also id.* at 9. He believed those statements to be truthful at the time. *Id.* at 16. Plaintiff Donnellon similarly testified that Blaine Donnellon said that he worked either for XOOM Energy or ACN and that her electricity bills would be lower if she switched to XOOM Energy. ECF No. 154-3 at 3, 8–9, 11, 16. She trusted him and thought he was telling the truth and was

---

[12] Defendants challenge this reasoning by pointing to a limiting principle for this type of vicarious liability that the Third Circuit offered in *Winback*, stating that "if the principal went to great lengths to ensure that the agents knew not to make certain representations, such representations, if made, *may* be found to be unforeseeable." ECF No. 122-1 at 18–19 (quoting *Winback*, 42 F.3d at 1438) (emphasis in original). Even if the Court applied that principle here, the ambiguities in the record about whether the IBOs received training materials directing them not to promise savings, and about what promises the IBOs were authorized to make, precludes such a broad exculpatory finding.

not exaggerating the savings she would experience. *Id.* at 11–12, 14. Nothing in this testimony, or in any other evidence in the record, suggests that Plaintiffs were aware that these promises of savings were unauthorized. Therefore, under Section 258 and the case law applying it, Defendants may be held vicariously liable for misrepresentations of the IBOs about savings if they were tortious. Restatement (Second) of Agency § 258. The Court will therefore proceed to considering the substance of each of the remaining claims.

### D. Remaining Claims

#### 1. NJCFA Claims

The remaining statutory claims by Plaintiffs Todd and Bonicos allege that Defendants violated the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8–1, *et seq.* The private cause of action available under that statute requires proof of three elements: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009). Actionable "unlawful conduct" is defined as

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, [sic] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

N.J. Stat. Ann. § 56:8–2; *see D'Agostino v. Maldonado*, 78 A.3d 527, 537 (N.J. 2013). "[Proof] of any one of those acts or omissions . . . will be sufficient to establish unlawful conduct under the Act." *D'Agostino*, 78 A.3d at 537 (quoting *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994)).

Defendants do not dispute the ascertainable loss or causation elements of the NJCFA claims. Instead, they maintain that they committed no unlawful conduct because regardless of what the IBOs may have said to Plaintiffs Todd and Bonicos, the written terms and conditions of the New Jersey Plaintiffs' plans with XOOM made clear that their rates would vary and made no promises of savings. ECF No. 122-1 at 26–29; ECF No. 133 at 15–18. Plaintiffs do not dispute that the agreements so provide, nor could they.[13] In a section titled "Price," Plaintiff Bonicos' agreement states that "Your rate for energy purchases will be a variable rate, per therm, that may change on a monthly basis, plus taxes and fees, if applicable." ECF No. 122-4 at 47. Plaintiff Todd's agreement similarly states that "Your rate for energy purchases will be a variable rate, per kilowatt, that may change on a monthly basis, plus taxes and fees, if applicable." *Id.* at 56. Neither agreement mentions savings.

Citing these provisions, Defendants urge the Court to follow the decisions of federal courts in New Jersey dismissing NJCFA claims on the ground that written contracts contained language authorizing allegedly unfair conduct. Defendants rely almost exclusively on *Urbino v. Ambit Energy Holdings, LLC*, which also involved alleged misrepresentations about energy

---

[13] Plaintiffs instead argue that they cannot be bound by the terms of these agreements because they never saw them. ECF No. 131 at 27–28. The Kulesa Declaration establishes, however, that the agreements were sent to email addresses that Plaintiffs Todd and Bonicos confirmed that they used. ECF No. 122-4 at 43–49 (Bonicos email), 53–58 (Todd email); ECF No. 122-6 at 16–17 (Bonicos testimony that he did not recall but may have received the email); ECF No. 122-8 at 19–20 (Todd testimony that he did not remember seeing the email but that it was possible). Longstanding principles of evidence law establish a presumption that properly sent mail was received, *see FDIC v. Schaffer*, 731 F.2d 1134, 1137 & n.6 (4th Cir. 1984), and in recent years courts have extended the presumption to emails, *see Ball v. Kotter*, 723 F.3d 813, 830 (7th Cir. 2013); *Am. Boat Co., Inc. v. Unknown Sunken Barge*, 418 F.3d 910, 914 (8th Cir. 2005); *SSI Med. Servs., Inc. v. State Dep't of Human Servs., Div. of Med. Assistance & Health Servs.*, 685 A.2d 1, 5–6 & n.1 (N.J. 1996). Plaintiffs offer no persuasive grounds to rebut the presumption. Courts have generally found that a party's failure to recall receiving a mailing or email is insufficient for this purpose and does not on its own create a genuine issue of material fact about whether the item was received. *See Dixon v. Synchrony Fin.*, No. 1:15-CV-00406-RWS-JFK, 2015 WL 12720290, at *5 (N.D. Ga. Aug. 18, 2015) (collecting cases); *Cox v. United States*, Nos. 1:12CR245–1, 1:13CV582, 2015 WL 1040577, at *3 (M.D.N.C. Mar. 10, 2015) (collecting cases), *adopted by* 2016 WL 792432 (M.D.N.C. Feb. 26, 2016). Declarations submitted by Plaintiffs Todd and Bonicos in which they each state "[t]o my knowledge, I never assented to, or even received, the contract" plainly do not deny receipt of the emails, but merely their recollections of receiving them. ECF No. 131-18 at 2–3. The Court thus will treat the agreements as having been received by the New Jersey Plaintiffs.

savings but determined that if a "valid contract" exists between the parties, "a court will dismiss a CFA claim if the defendant's allegedly unlawful conduct is expressly authorized by the terms of the parties' agreement." *Urbino v. Ambit Energy Holdings, LLC*, No. 14–5184 (MAS)(DEA), 2015 WL 4510201, at *1, *3 (D.N.J. July 24, 2015) (citing *Hassler v. Sovereign Bank*, 374 F. App'x 341, 344 (3d Cir. 2010)).

*Urbino* and the cases it cites rely on an unpublished Third Circuit opinion, *Hassler v. Sovereign Bank*, that addressed whether the terms of a bank customer's agreement with the bank omitted information about overdraft fees in a manner that violated the NJCFA. *See* 374 F. App'x at 342–43. Relying on New Jersey state court case law, the court explained that the plaintiff's claim failed because his contract with the bank – the only source of any agreement between the parties – "clearly explained the actions that [the bank] eventually undertook." *Id.* at 344 (citing *Rosenberg v. Wash. Mut. Bank, FA*, 849 A.2d 566, 573 (N.J. Super. Ct. App. Div. 2004); *N.J. Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174 (N.J. Super Ct. App. Div. 2003)). *Hassler* was explicit in its analysis, however, that it addressed only the viability of NJCFA claims arguing that written statements were unlawful. "Whether a practice itself is unfair is a classic jury question," the court explained. *Id.* "However, where the claim is based on written statements, the court must make the legal determination of whether a practice can be said to be unfair in light of the written statements." *Id.*

In *Urbino*, however, the court appeared to apply *Hassler*'s rule to conclude that *whenever* a written contract exists between the parties – regardless of any alleged misrepresentations that might have induced the plaintiff to enter that agreement – an NJCFA claim fails as a matter of law if the agreement authorizes conduct allegedly inconsistent with the prior representations. *See Urbino*, 2015 WL 4510201, at *3. Therefore, *Urbino* concluded, it was irrelevant whether

statements about energy savings on the defendant's website and in marketing materials were unlawfully misleading, as the plaintiff claimed, because "the parties [were] governed by a written contract that explicitly allow[ed] [the defendant energy provider] to change the price of energy." *Id.* at *4.

The Court respectfully disagrees with this reading of *Hassler*, for which the court in *Urbino* pointed to no support in New Jersey state court case law.[14] *Hassler* simply did not contemplate or address a scenario in which a defendant or the defendant's agent allegedly made misleading oral representations to induce the plaintiff into subscribing to the defendant's service. It concerned only the legality of statements in a pre-existing agreement. In contrast, Plaintiffs here assert that Defendants, through the IBOs, made misrepresentations that Plaintiffs would save money by switching to XOOM and failed to disclose that XOOM's rates would instead significantly exceed Plaintiffs' local utilities' rates. ECF No. 131-10 at 8–9, 11; ECF No. 154-4 at 17–18, 20, 23–24. Nothing in *Hassler* forecloses that claim. The factual questions of whether those alleged misrepresentations or omissions were made as Plaintiffs describe them, and whether they can be imputed to Defendants, are disputed, material issues of fact that cannot be settled at summary judgment. As *Hassler* explained, "[w]hether a practice itself is unfair [under the NJCFA] is a classic jury question." 374 F. App'x at 344.

Defendants also argue that integration clauses in the New Jersey Plaintiffs' agreements bar their claims. The agreements indeed include clauses stating that "[t]his Agreement constitutes the entire agreement and understanding between you and XOOM with respect to its subject matter and superseding all prior written and oral agreements and representations made

---

[14] The court in *Urbino* relied primarily on another case from the District of New Jersey, *Faistl v. Energy Plus Holdings, LLC*, which read *Hassler* in the same way. No. 12–2879 (JLL), 2012 WL 3835815, at *6 (D.N.J. Sept. 4, 2012).

with respect to such subject matter." ECF No. 122-4 at 49, 58. But the function of an integration clause under New Jersey law is to prohibit introduction of parol evidence to alter the terms of a contract. *See CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 155 (D.N.J. 2013) (citing *Conway v. 287 Corp. Ctr. Assocs.*, 901 A.2d 341, 346 (N.J. 2006)). And Plaintiffs here do not challenge the meaning of the terms of their agreements with XOOM, but rather the tactics used to persuade them to enter those agreements. "It is well settled that a party to an agreement cannot, simply by means of a provision in the written instrument, create an absolute defense or prevent the introduction of parol evidence in an action based on fraud in the inducement to contract." *Filmlife, Inc. v. Mal "Z" Ena, Inc.*, 598 A.2d 1234, 1235 (N.J. Super. Ct. App. Div. 1991) (quoting *Ocean Cape Hotel Corp. v. Masefield Corp.*, 164 A.2d 607, 611 (N.J. Super. Ct. App. Div. 1960)). Such evidence is admitted "because it is not offered to alter or vary express terms of a contract, but rather, to avoid the contract or 'to prosecute a separate action predicated upon the fraud.'" *Id.* (quoting *Ocean Cape Hotel Corp.*, 164 A.2d at 611).

The limiting principle on this rule is that the claim of fraud must concern "matters wholly extraneous to the writing" and may not be premised on "matters expressly addressed in the integrated writing." *Id.*; *see Walid v. Yolanda for Irene Couture, Inc.*, 40 A.3d 85, 93–94 (N.J. Super. Ct. App. Div. 2012). Here, the only language in the New Jersey Plaintiffs' agreements addressing the price they would pay states that "[y]our rate for energy purchases" may vary based on "XOOM's actual and estimated supply costs which may include but may not be limited to, prior period adjustments, inventory and balancing costs." ECF No. 122-4 at 56; *see id.* at 47 (using slightly different but functionally identical language). A statement that customers' rates may vary does not speak to the absolute cost that customers will pay in comparison to their rates with their existing energy providers, which is the substance of the alleged misrepresentations by

the IBOs. For example, Plaintiff Bonicos asserts that he was told he could save "roughly five to ten percent versus what [his existing provider] would charge." ECF No. 131-10 at 3. The issue of these relative savings compared to the customer's prior service is not addressed, implicitly or expressly, by the price terms provided in the agreement. Indeed, as Defendants prominently assert, "nothing in the Bonicos and Todd contracts mentioned or guaranteed savings of any kind." ECF No. 122-1 at 29. For these reasons, the integration clause in the New Jersey Plaintiffs' agreements offers little support for Defendants.[15]

Finally, Defendants argue that summary judgment is warranted on Plaintiff Todd's NJCFA claim because it is based on puffery. *Id.* at 29. Defendants point specifically to Plaintiff Todd's statement at his deposition that he was told by the IBO that the IBO could "save [him] significant money by switching over to" what Plaintiff Todd "assum[ed] . . . [was] a third party provider for [his] energy services." ECF No. 122-8 at 6. Citing a finding in *Urbino* that promises of "substantial savings" and "great savings" were puffery, Defendants claim that this representation to Plaintiff Todd is not actionable under the NJCFA. ECF No. 122-1 at 29 (citing *Urbino*, 2015 WL 4510201, at *5 n.7). The Court has already held in two prior decisions, however, that the statements alleged in Plaintiffs' complaints were sufficiently specific. ECF No. 50 at 22–23; ECF No. 67 at 16. And though the statements that Plaintiff Todd related in his deposition differ slightly from what was alleged in the Second Amended Complaint, the Court reaches the same conclusion here.

Plaintiff Todd testified that he was told he would receive "significant savings" and "monthly savings" on his electric bill by switching to XOOM Energy. ECF No. 154-4 at 22. This

---

[15] That the court in *Urbino* gave greater weight to the presence of integration clause in that case is again unpersuasive because the court again drew on no New Jersey case law for its analysis and conclusion. *See Urbino*, 2015 WL 4510201, at *4.

statement is sufficiently concrete to avoid the label of puffery, which in New Jersey refers to "an exaggeration or overstatement expressed in broad, vague, and commendatory language." *EP Henry Corp. v. Cambridge Pavers, Inc.*, 383 F. Supp. 3d 343, 349 (D.N.J. 2019) (quoting *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)). Statements that Plaintiff Todd would experience significant savings on his monthly electric bill if he switched to XOOM are not "broad, vague, and commendatory," but rather make a specific promise of financial benefit over an identified period of time. *Id.* They are therefore not puffery. Thus, because the Court finds none of Defendants' arguments persuasive, the Court will decline to grant summary judgment on the NJCFA claims.

### 2. New Jersey Common Law Fraud Claims

The Court next turns to the New Jersey Plaintiffs' remaining common law claims against XOOM Energy and ACN. The Second Amended Complaint alleges claims of "common law fraud, including fraudulent inducement, and fraudulent concealment." ECF No. 57 at 30. "The elements of common-law fraud [in New Jersey] are '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" *Allstate N.J. Ins. Co. v. Lajara*, 117 A.3d 1221, 1231 (N.J. 2015) (quoting *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 261 (N.J. 2005)).

Those elements are required to establish a claim for fraudulent inducement, *see RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012), and for fraudulent concealment, *see Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 602 (D.N.J. 2016); *Winslow v. Corp. Express, Inc.*, 834 A.2d 1037, 1044 (N.J. Super. Ct. App. Div. 2003), though a plaintiff alleging fraudulent concealment must also show that "there was a duty to disclose

because of a special relationship between the parties." *Argabright v. Rheem Mfg. Co.*, 258 F. Supp. 3d 470, 489 (D.N.J. 2017) (citing *Lightning Lube Co. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993)); *see also United Jersey Bank v. Kensey*, 704 A.2d 38, 43–44 (N.J. Super. Ct. App. Div. 1997). "The question of whether a duty exists is a matter of law." *Kensey*, 704 A.2d at 43. "[A] party has no duty to disclose information to another party in a business transaction unless a fiduciary relationship exists between them, unless the transaction itself is fiduciary in nature, or unless one party 'expressly reposes a trust and confidence in the other.'" *N.J. Econ. Dev. Auth. v. Pavonia Restaurant, Inc.*, 725 A.2d 1133, 1139 (N.J. Super. Ct. App. Div. 1998) (quoting *Berman v. Gurwicz*, 458 A.2d 1311, 1314 (N.J. Super. Ct. Ch. Div. 1981)).

Defendants argue that summary judgment is appropriate on three grounds. First, Defendants claim that Plaintiffs Todd and Bonicos could not have reasonably relied on the alleged oral misrepresentations by the IBOs because their written agreements allowed XOOM Energy to vary its prices. ECF No. 122-1 at 31. Defendants correctly identify a principle of New Jersey law that "[r]eliance is not reasonable" in a fraud claim "where the substance of the alleged misstatement is contradictory of the undertakings expressly dealt with by the written contract." *Luso Fuel Inc. v. BP Prods. N. Am., Inc.*, No. 08–CV–3947 (DMC), 2009 WL 1873583, at *5 (D.N.J. June 29, 2009) (citing *Winonka Vill., Inc. v. Tate*, 84 A.2d 626, 628 (N.J. Super. Ct. App. Div. 1951)). But as the Court has explained in addressing the NJCFA claims, the alleged misstatements here do not contradict the terms of the agreements. The New Jersey Plaintiffs were promised savings on their energy bills in comparison to the rates they were paying with their current providers. That their rates with their new provider might vary from month to month is reconcilable and consistent with those statements. The reasonableness of their reliance on the statements cannot be determined as a matter of law and is therefore not an issue that may be

resolved at summary judgment.

Nor is the Court swayed by Defendants' argument that the statement allegedly made to Plaintiff Todd was non-actionable puffery. ECF No. 122-1 at 32. The Court already rejected that argument in assessing the NJCFA claim and it is no more persuasive here. Finally, Defendants argue that the New Jersey Plaintiffs cannot proceed with a fraudulent concealment claim because they have failed to demonstrate that Defendants owed them a duty of disclosure. *See id.* On this issue, Defendants are correct. Plaintiffs have made no showing of a special relationship between them and Defendants that would give rise to a duty to disclose under New Jersey law, nor have they even acknowledged this argument in their brief. *See Lightning Lube, Inc.*, 4 F.3d at 1185 (discussing three types of special relationships that give rise to a duty to disclose); *see also Kensey*, 704 A.2d at 44 (same). And "New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'" *Lightning Lube, Inc.*, 4 F.3d at 1185 (quoting *Berman*, 458 A.2d at 1313)*.* For these reasons, the Court will grant summary judgment to Defendants on the fraudulent concealment component of the New Jersey Plaintiffs' common law fraud claims. But summary judgment will be denied on the common law fraud claims in all other respects.

### 3. New Jersey Negligent Misrepresentation

The New Jersey Plaintiffs' final claim is for negligent misrepresentation. That claim requires a plaintiff to demonstrate that "(1) the defendant negligently made an incorrect statement; (2) the plaintiff justifiably relied on that statement; and (3) the plaintiff, as a consequence of that reliance, suffered damages." *TekDoc Servs., LLC v. 3I-Infotech Inc.*, No. 09–6573 (MLC), 2012 WL 3560794, at *19 (D.N.J. Aug. 16, 2012) (citing *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1195 (N.J. 2000); *Indian Brand Farms, Inc. v. Novartis Crop Prot. Inc.*,

617 F.3d 207, 218 (3d Cir. 2010)).[16] The only argument Defendants make in support of summary judgment on this claim is that the New Jersey Plaintiffs could not have justifiably relied on the representations of the IBOs because they were contradicted by the written agreements. ECF No. 122-1 at 31. Because the Court has already rejected this argument in addressing the fraud claims, summary judgment will be denied with respect to the negligent misrepresentation claim as well.

### 4. Maryland Claims

The Court finally turns to Plaintiff Donnellon's remaining claims for common law fraud and violation of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-101 *et seq.* As with the New Jersey Plaintiffs, Plaintiff Donnellon's common law fraud allegations are asserted as claims of both fraudulent inducement and fraudulent concealment. ECF No. 57 at 30. In Maryland, "fraud in the inducement is a subspecies of fraud." *Sass v. Andrew*, 832 A.2d 247, 261 (Md. App. 2003). "To prevail on a claim for fraud, a plaintiff must show: '(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.'" *Gourdine v. Crews*, 955 A.2d 769, 791 (Md. 2008) (quoting *Md. Envtl. Tr. v. Gaynor*, 803 A.2d 512, 516 (Md. 2002)). "The essential elements for a claim of fraudulent concealment include: '(1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in

---

[16] Federal courts in New Jersey have varied slightly in describing the elements of this claim, which New Jersey's state courts have not articulated with the same clarity used to define common law fraud, but this formulation is representative. *See, e.g.*, *Elias v. Ungar's Food Prods, Inc.*, 252 F.R.D. 233, 251 (D.N.J. 2008).

justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment.'" *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 274 (Md. 2007) (quoting *Green*, 735 A.2d at 1059).

The Maryland Court of Appeals has clarified the first element of a fraudulent concealment claim, explaining that "[a]bsent a fiduciary relationship . . . a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence, and that, in such cases, the affirmative act on the part of the defendant must be more than mere silence; there must be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known." *Id.* (citations omitted) (quoting *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 976 n.14 (Md. 2000)). No such allegations have been made or substantiated by Plaintiffs here. Nor have Plaintiffs put forth evidence to establish a fiduciary duty or a duty to disclose originating from another source, and the Court will not imply one. "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party." *Md. Envtl. Tr.*, 803 A.2d at 516 (citing *Fegeas v. Sherrill*, 147 A.2d 223, 225 (Md. 1958)). The Court will therefore grant summary judgment to Defendants on the fraudulent concealment component of Plaintiff Donnellon's common law fraud claim.

The Court next turns to the MCPA and fraudulent inducement claims, which are most effectively considered together. The MCPA prohibits the use of "any unfair, abusive, or deceptive trade practice" in "[t]he sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services." Md. Code Ann., Com. Law § 13-303; *see MRA Prop. Mgmt, Inc. v. Armstrong*, 43 A.3d 397, 410 (Md. 2012) (describing an earlier but largely similar

version of the statute). "Unfair, abusive, or deceptive trade practices include," among other things, any "[f]alse . . . or misleading oral or written statement . . . or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;" any "failure to state a material fact if the failure deceives or tends to deceive;" and any "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods . . . or consumer service." Md. Code Ann., Com. Law § 13-301(1), (3), (9). The statute provides a private cause of action to "any person . . . to recover for injury or loss sustained by him as the result of a practice prohibited by this title." *Id.* § 13-408; *see Lloyd*, 916 A.2d at 277. A plaintiff "must allege (1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury." *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012) (citing *Lloyd*, 916 A.2d at 277).

Courts assessing MCPA claims and common law fraud claims stemming from the same alleged false statements have held that the plaintiff's reliance on those statements must be reasonable for either type claim to proceed. *See Green v. Wells Fargo Bank, N.A.*, 927 F. Supp. 2d 244, 253–5 (D. Md. 2013), *aff'd*, 582 F. App'x. 246 (4th Cir. 2014) (per curiam); *Goss v. Bank of Am., N.A.*, 917 F. Supp. 2d 445, 450 (D. Md. 2013). Generally,"[f]or a plaintiff to have a right to rely on an alleged misrepresentation, the plaintiff must reasonably believe in the 'full truth' of the misrepresentation." *Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F. Supp. 2d 505, 536 (D. Md. 2011) (citing *James v. Goldberg*, 261 A.2d 753, 758 (Md. 1970)). Defendants here argue that they did not engage in common law fraud or an unlawful practice under the MCPA because regardless of what the IBO may have said to Plaintiff Donnellon, the terms and conditions of her written agreement made clear that her rates would vary and made no promises

of savings. ECF No. 122-1 at 34–35.

This argument has more force here than it does with respect to the New Jersey Plaintiffs because it accurately describes Plaintiff Donnellon's contract, which contains substantially different price terms from the contracts used in New Jersey.[17] Specifically, the "Price" section of the agreement states that "[y]ou agree and understand that the price can fluctuate from month-to-month and could be higher or lower than your Local Utility's standard offer rate in any given month, and XOOM cannot guarantee savings over your Local Utility's rates for the any [sic] given month or for the entire term of this Agreement." ECF No. 122-4 at 66. Unlike the sparse language about variable rates in the New Jersey Plaintiffs' agreements, this provision specifically disclaims any assertions or warranties that XOOM Energy's service would have consistently lower rates than a customer's existing utility.

On this ground, Defendants maintain that Plaintiff Donnellon "did not have a right to rely" on the alleged representations of the IBOs that contradicted her written agreement. ECF No. 122-1 at 36. But contrary to Defendants' claims, Maryland courts have not fully answered the question of whether reliance on oral misrepresentations may be reasonable even though they are contradicted by the terms of a written agreement. As Judge Blake of this Court cogently explained in *Price v. Berman's Automotive, Inc.*, "[t]he Court of Appeals of Maryland has not squarely addressed whether, in an action for fraud, reliance on a misrepresentation is always

---

[17] As with the New Jersey Plaintiffs, Plaintiffs argue again that Plaintiff Donnellon cannot be bound to the terms and conditions of her agreement with XOOM Maryland because she never saw them. ECF No. 131 at 34–35. But the Kulesa Declaration establishes that an email with a link to the agreement was sent to an address submitted with Plaintiff Donnellon's enrollment application for XOOM, ECF No. 122-4 ¶ 76–77; *id.* at 62–64, 66–69. Plaintiff Donnellon confirmed that the email address belonged to her ex-husband Mark Donnellon, whom she authorized, along with his son, IBO Blaine Donnellon, to switch her to XOOM from her local utility. ECF No. 133-1 at 2; ECF No. 122-7 at 11, 24–27. In doing so, Plaintiff Donnellon created a simple agency relationship between herself as principal and her ex-husband and his son as agents, granting them actual authority to execute a contract for her. *See Dickerson*, 995 A.2d at 735. Plainly, Plaintiff Donnellon as principal can be held responsible for the terms of a contract that she directed her agents to enter on her behalf, and which she then performed by paying her bills for XOOM service for approximately six months. ECF No. 122-4 ¶¶ 78–80; ECF No. 154-3 at 23.

unreasonable where the misrepresentation directly contradicts a contractual term." No. CCB-14-763, 2014 WL 5686550, at *6 (D. Md. Nov. 4, 2014). In a 1970 case presenting this issue, "the Court of Appeals of Maryland appeared to endorse a fact-based inquiry instead of a per se rule" when it discussed the plaintiff's status as a law school graduate in assessing the unreasonableness of his reliance on an alleged misrepresentation. *Id.* (citing *James*, 261 A.2d at 755–58).

Additionally, "the Court of Special Appeals of Maryland has recognized that 'in certain instances, fraud can be premised on representations that are inconsistent with a written agreement....'" *Id.* (quoting *First Union Nat. Bank v. Steele Software Sys. Corp.*, 838 A.2d 404, 441–42 (Md. App. 2003)). "One such instance appeared in *Parker v. Columbia Bank*," in which that court considered the unsophistication and inexperience of the plaintiff home buyers in rejecting the defense that the oral representations on which they relied contradicted the terms of their loan agreement. *Id.* (citing 604 A.2d 521, 523, 529–30 (Md. App. 1992)). "Fourth Circuit cases addressing the issue have also looked to reliance on statements contradicted in written agreements as a factor in determining reasonableness, rather than as an absolute bar." *Id.* (citing *Foremost Guar. Corp. v. Meritor Sav. Bank*, 910 F.2d 118, 125 (4th Cir. 1990); *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 631–32 (4th Cir. 1977)).

To be sure, some courts have read these precedents to establish a per se rule. *See, e.g.*, *Lehner v. ProSource Consulting LLC*, No. CV GLR-18-858, 2018 WL 6395539, at *9 (D. Md. Dec. 6, 2018). Defendants rely almost exclusively on one such case, *Daniyan v. Viridian Energy LLC*, which dismissed an MCPA claim against an energy supplier that had allegedly made promises of savings because the supplier's website also disclosed that its rates may be higher than the local utility's. No. GLR–14–2715, 2015 WL 4031752, at *2–*3 (D. Md. June 30, 2015). But given the lack of clarity on this issue among Maryland state courts, and the case law

insightfully illuminated by Judge Blake in *Price*, the Court will decline to apply such a rule here. Instead, the Court will follow *Price*'s approach by concluding that "the mere fact that the alleged misrepresentation[s] here contradicted the [written agreement's] terms does not present an absolute bar to [Plaintiff Donnellon's] fraud claim," nor to her MCPA claim based on the same statements. *Price*, 2014 WL 5686550, at *7. The question of whether it was reasonable for Plaintiff Donnellon to rely on the asserted misstatements of the IBO who convinced her to switch to XOOM Energy is a question for the finder of fact. Because Defendants have made no further arguments on these claims, the Court will deny summary judgment on Plaintiff Donnellon's MCPA and fraudulent inducement claims.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 122, is granted in part and denied in part, and Defendants' Motion to Strike, ECF No. 134, is granted in part and denied as moot in part. The Court will grant summary judgment for Defendants on all claims against XOOM Maryland and on all claims of fraudulent concealment. Summary judgment will be denied with respect to Plaintiff Donnellon's MCPA and common law fraud claims against XOOM Energy and ACN and the New Jersey Plaintiffs' claims against XOOM Energy and ACN for violation of the NJCFA, common law fraud, and negligent misrepresentation. A separate Order shall issue.


Date: <u>March 31, 2020</u>                              /s/_____
                                                          GEORGE J. HAZEL
                                                          United States District Judge