**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |
|---|---|
| **MICHAEL TODD**, *et al.*, | * |
| **Plaintiffs,** | * |
| v. | *      **Case No.: GJH-15-154** |
| **XOOM ENERGY MARYLAND, LLC**, *et al.*, | * |
| **Defendants.** | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Plaintiffs Michael Todd, Jerome Bonicos, and Elizabeth Donnellon bring this statutory and common law consumer fraud action against Defendants XOOM Energy, LLC ("XOOM Energy" or "XOOM"), an electricity and natural gas supplier, and ACN, Inc. ("ACN"), a marketing company that promotes XOOM's services to consumers. ECF No. 59. On March 31, 2020, the Court granted in part and denied in part Defendants' Motion for Summary Judgment. ECF No. 175. Now pending before the Court is Plaintiffs' Amended Motion for Class Certification and Appointment of Class Counsel. ECF No. 161. No hearing is necessary. *See* Loc. R. 105.6 (D. Md.). For the following reasons, Plaintiffs' Motion will be denied.

**I.**      **BACKGROUND**

The Court summarized the facts of this case in its Memorandum Opinion addressing Defendants' Motion for Summary Judgment, ECF No. 175 at 1–5, and now restates the relevant facts as presented in the parties' exhibits concerning class certification, as well as in materials from the summary judgment record to which the parties cite or allude.

1

Defendant XOOM Energy is "the parent company of 20 subsidiary companies" that "supply electricity and/or natural gas in 19 states and the District of Columbia." ECF No. 167-6 ¶¶ 4, 6. The subsidiaries have no employees and are managed by XOOM Energy. ECF No. 162-2 at 5–6.[1] XOOM operates in states that have deregulated their energy markets, which allows consumers to purchase energy from entities other than their local utility, although the utility operates and maintains the physical infrastructure that transports that energy to the consumer's location. *See* ECF No. 122-4 at 21. Each XOOM subsidiary supplies energy in only one state, although many states have multiple "energy markets" that are "served by one or more utilities." ECF No. 167-6 ¶¶ 7–8. The area in which a utility provides energy is that utility's "service area," and XOOM subsidiaries within a given state may provide energy in multiple utilities' service areas within the state. *Id.* ¶¶ 8–9. XOOM subsidiaries offer both fixed rate plans, the monthly rates for which remain constant during the term of the plan, and variable rate energy plans, in which rates may vary each month. ECF No. 122-4 ¶¶ 6–8. XOOM variable rate plans are branded as "Simpleflex" plans. *See* ECF No. 122-4 at 47, 56, 66.

XOOM works with several companies that promote its energy services to potential customers, including Defendant ACN. ECF No. 122-4 ¶ 31; ECF No. 167-5 ¶ 7. ACN, which is a trade name of the entity LKN Communications, Inc. ("LKN"), maintains a subsidiary called ACN Opportunity, LLC ("ACN Opportunity") which "administers a program through which independent contractors known as Independent Business Owners ('IBOs') may promote or refer customers to various products and services." ECF No. 122-5 ¶¶ 2, 5. This includes the energy plans offered by XOOM Energy subsidiaries. *Id.* ¶ 10, 20–21. IBOs are not employees of XOOM Energy or any of its subsidiaries, nor of LKN or any ACN entity. *Id.* ¶ 6; ECF No. 122-4 ¶ 33.

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

However, IBOs can "earn commissions and bonuses in connection with certain products and services" that they successfully promote, including XOOM Energy's. *Id.* ¶ 8. ACN Opportunity pays these commissions and bonuses with funds provided by XOOM. ECF No. 122-4 ¶ 58.

In order to become an IBO, a person or company must "enter into an IBO Agreement with ACN Opportunity" on a website. ECF No. 122-5 ¶ 11–12. To promote and receive commissions for XOOM services, XOOM requires IBOs to pass a XOOM accreditation test after reviewing XOOM training materials. *Id.* ¶ 23; ECF No. 122-4 ¶¶ 36, 45–48. Some of these materials direct IBOs not to promote or promise to consumers that switching to XOOM will result in savings unless such promises of savings are stated on XOOM's website. ECF No. 122-4 ¶¶ 38–41, 60, 63; *see also id.* at 31, 34, 37. Training materials also state that "[c]ustomers must place their own orders" for XOOM's services on its website and "need[] to sign themselves up for service." *Id.* at 31–32; *see also id.* ¶¶ 42–43. Individuals interested in XOOM services may also access the XOOM website and enroll without an IBO, though "several hundred thousand" of XOOM subsidiaries' customers have been referred by IBOs. ECF No. 167-5 ¶¶ 7–8.

Plaintiffs in this case are New Jersey residents Jerome Bonicos and Michael Todd (the "New Jersey Plaintiffs") and Maryland resident Elizabeth Donnellon. At their depositions, each Plaintiff testified that an IBO contacted them promising savings on their monthly energy bills if they switched to XOOM, but that after they were switched their bills instead increased. Plaintiff Bonicos testified that in 2014, William Stracher, a longtime friend, came to Bonicos's house, said that he was working for XOOM Energy, and could "save [Bonicos] five or ten percent on [his] gas bill" as compared to his local utility. ECF No. 162-7 at 3, 8; *see also id.* at 4, 6–7. After he switched to a variable rate XOOM plan, however, Bonicos's bills significantly exceeded what he would have paid to his local utility, leading him to leave XOOM and return to his prior

3

provider. *Id.* at 9–12.

Plaintiff Todd testified that in either 2013 or 2014, a family member – either Lucille DelVecchio or Phil DelVecchio, both of whom were IBOs – called him and said that they "could save [him] significant money by switching over to . . . a third party provider for [his] energy services." ECF No. 162-8 at 3, 5–6; *see also id.* at 8–9, 11, 15. The caller then asked him to provide a copy of his existing utility bill, which he did, after which his service was switched to a variable rate XOOM plan. *Id.* at 7. Instead of saving money, however, Todd's monthly bills were higher than they had ever been with his local utility. *Id.* at 13–14, 16–17. Todd thus left XOOM and returned to the utility. *Id.* at 16–17.

Finally, Plaintiff Donnellon testified that "a couple years" before her 2018 deposition, she was visited by her ex-husband Mark's son, Blaine Donnellon, who said he was a representative of XOOM Energy and told her that she would save money on her electricity bills by switching to XOOM because her bills would be lower than with her existing provider. ECF No. 162-9 at 3–4, 6–8, 12; ECF No. 122-7 at 5–6. Plaintiff Donnellon then gave Blaine a bill from her existing provider and allowed Blaine to switch her energy service to a XOOM variable rate plan. ECF No. 162-9 at 8. Although Donnellon experienced savings for one month, her bills increased beginning in the second month of XOOM service. *Id.* at 9–10, 15. She eventually decided to cancel her XOOM service and return to her utility, and she also applied for a public energy assistance program to help her afford her electric bill. *Id.* at 16–18.

Plaintiff Todd and a plaintiff who has since left the case filed this action on January 16, 2015 against XOOM, ACN, and XOOM state subsidiaries XOOM Energy Maryland, LLC and XOOM Energy New Jersey, LLC ("XOOM Maryland" and "XOOM New Jersey"). ECF No. 1. On March 25, 2015, the current Plaintiffs filed an Amended Complaint that asserted several

claims under Maryland, New Jersey, and North Carolina statutes and common law. ECF No. 33. On February 22, 2016, the Court issued a Memorandum Opinion and an Order dismissing without prejudice all but two of the claims. ECF No. 50 at 28–29; ECF No. 51. Plaintiffs filed a Second Amended Complaint on March 21, 2016 that realleged most of the same claims as the first with the exception of any claims under North Carolina law or against XOOM New Jersey. ECF No. 57.

Defendants moved to dismiss the Second Amended Complaint on April 20, 2016, ECF No. 59, and the Court granted the motion in part and denied it in part on February 16, 2017, ECF Nos. 67, 68. On June 28, 2019, Defendants moved for summary judgment on all remaining claims. ECF No. 122. Defendants later filed a Motion to Strike an exhibit to Plaintiffs' Opposition, the declaration of Plaintiffs' expert Frank A. Felder, Ph.D. ECF No. 134. On August 28, 2019, Plaintiffs filed a Motion for Class Certification and Appointment of Class Counsel. ECF No. 141. Plaintiffs filed an amended class certification motion on December 23, 2019. ECF No. 161. Defendants filed an Opposition to certification on January 13, 2020, ECF No. 167, and Plaintiffs filed a Reply in support on February 3, 2020, ECF No. 173.

On March 31, 2020, the Court issued a Memorandum Opinion granting in part and denying in part Defendants' Motion for Summary Judgment. ECF No. 175. The Court granted summary judgment on all claims of fraudulent concealment and all claims against XOOM Maryland, which was accordingly dismissed from the case. ECF No. 176. The Court denied summary judgment as to Maryland common law fraud and Maryland Consumer Protection Act claims by Plaintiff Donnellon and as to the New Jersey Plaintiffs' New Jersey common law fraud and negligent misrepresentation claims and claims under the New Jersey Consumer Fraud Act. *Id.* All remaining claims are asserted against both XOOM Energy and ACN. *See id.*

Finally, because some of the opinions set forth in Dr. Felder's declaration were not timely

disclosed, the Court granted Defendants' Motion to Strike to the extent that the Court did not

consider the declaration in adjudicating the summary judgment motion. *Id.*; *see* ECF No. 175 at

7–11. The Motion was otherwise denied as moot because Plaintiffs submitted an Amended

Declaration of Dr. Felder, ECF No. 162-10, in support of their Amended Motion for Class

Certification and Appointment of Class Counsel, ECF No. 161. The Court deferred consideration

of the amended certification motion, ECF No. 175 at 11, and denied as moot the superseded

original motion, ECF No. 177.

## II.    STANDARD OF REVIEW

District courts possess "wide discretion" in deciding whether to certify a class. *Ward v.*

*Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010) (quoting *Cent. Wesleyan Coll. v.*

*W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993)). Federal Rule of Civil Procedure 23(a)

requires that a prospective class "comply with four prerequisites: (1) numerosity; (2)

commonality; (3) typicality; and (4) adequacy of representation." *EQT Prod. Co. v. Adair*, 764

F.3d 347, 357 (4th Cir. 2014) (citing Fed. R. Civ. P. 23(a)). "[N]umerosity requires that a class

be so large that 'joinder of all members is impracticable.'" *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d

138, 146 (4th Cir. 2001) (quoting Fed. R. Civ. P. 23(a)(1)).

"Commonality requires that 'there are questions of law or fact common to the class.'" *Id.*

(quoting Fed. R. Civ. P. 23(a)(2)). For this requirement to be met, the proceeding must not only

raise common questions, but must also be able "to generate common *answers* apt to drive the

resolution of the litigation." *EQT Prod. Co.*, 764 F.3d at 360 (quoting *Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338, 350 (2011)). "Typicality requires that the claims of the named class

representatives be typical of those of the class; 'a class representative must be part of the class

and possess the same interest and suffer the same injury as the class members.'" *Lienhart*, 255 F.3d at 146 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). Finally, "[u]nder the adequacy requirement of Rule 23(a)(4), a district court may certify a class only if the class representative 'will fairly and adequately protect the interests of the class.'" *Ward*, 595 F.3d at 179 (quoting Fed. R. Civ. P. 23(a)(4)).

In addition to satisfying the requirements of Rule 23(a), "the class action must fall within one of the three categories enumerated in Rule 23(b)." *EQT Prod. Co.*, 764 F.3d at 357 (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003)). Plaintiffs here seek certification under Rule 23(b)(3). ECF No. 162 at 23. "[C]ertification under Rule 23(b)(3) is appropriate when all of the prerequisites of Rule 23(a) are satisfied and two other requirements are met." *Id.* (citing *Dukes*, 564 U.S. at 362). "Specifically, (1) common questions of law or fact must predominate over any questions affecting only individual class members; and (2) proceeding as a class must be superior to other available methods of litigation." *Id.* (citing Fed. R. Civ. P. 23(b)(3)). "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)).

"A party seeking class certification must do more than plead compliance with the aforementioned Rule 23 requirements." *EQT Prod. Co.*, 764 F.3d at 357 (citing *Dukes*, 564 U.S. at 350). "Rather, the party must present evidence that the putative class complies with Rule 23." *Id.* (citing *Comcast Corp.*, 569 U.S. at 33). "It is the plaintiffs' burden to demonstrate compliance with Rule 23, but the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *Id.* at 358 (citing *Dukes*, 564 U.S. at 351). "Although Rule 23 does not give district courts a 'license to engage in

free-ranging merits inquiries at the certification stage,' a court should consider merits questions to the extent 'that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Id.* at 357–58 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

## III.   DISCUSSION

Plaintiffs move the Court to certify one class and two subclasses. ECF No. 161. The class is defined as "[a]ll persons who are or have been Simpleflex XOOM Energy customers in California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Texas, Virginia who (1) used XOOM as their electricity supplier, and (2) used XOOM as their natural gas supplier." *Id.* Plaintiffs' proposed subclasses include "[a]ll persons who are or have been Simpleflex customers of XOOM Energy, New Jersey, LLC" and "[a]ll persons who are or have been Simpleflex customers of XOOM Energy, Maryland, LLC." ECF No. 161. For clarity, the Court refers to the subclasses as the "New Jersey Subclass" and the "Maryland Subclass," respectively, and the multistate class as "the Class."

The Second Amended Complaint asserts Plaintiff Donnellon's Maryland Consumer Protection Act claim on behalf of the Maryland Subclass and the New Jersey Plaintiffs' New Jersey Consumer Fraud Act claim on behalf of the New Jersey Subclass. ECF No. 57 at 24–28. Plaintiffs' common law fraud and negligent misrepresentation claims are asserted on behalf of the class and both subclasses. *Id.* at 30–31.[2] Plaintiffs also seek appointment of Todd, Donnellon, and Bonicos as class representatives and of their counsel's firms, Cuneo Gilbert & LaDuca LLP and Whitfield Bryson & Mason LLP, as class counsel. ECF No. 161 at 1–2. On May 5, 2020,

---

[2] While the Second Amended Complaint also asserts a breach of contract claim on behalf of the classes, that claim has been dismissed. *See* ECF No. 67.

Plaintiffs' two attorneys affiliated with Whitfield Bryson & Mason alerted the Court that they are now members of the firm Mason Lietz & Klinger LLP. ECF No. 179. The Court will presume that Plaintiffs wish to substitute that firm for the attorneys' prior firm as proposed class counsel.

The Court now turns to each of the requirements for class certification and notes two initial issues. First, Defendants apparently concede that Plaintiffs can satisfy the numerosity requirement. ECF No. 167 at 13. Rule 23(a)(1) states that the proposed class must be "so numerous that joinder of all members is impracticable." Fed R. Civ. P. 23(a)(1). "Classes of as few as 25 to 30 have been found to 'raise [] the presumption that joinder would be impracticable.'" *Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 770 (D. Md. 2012) (alteration in original) (quoting *In re Kirschner Med. Corp. Sec. Litig.,* 139 F.R.D. 74, 78 (D. Md. 1991)). "Where 'general knowledge and common sense' indicate the class is so large that joinder of all members is impracticable, the numerosity requirement is satisfied." *Id.* (quoting *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556 (D. Md. 2006)). Here, given that the proposed class definitions include all XOOM customers in the states at issue, it appears certain that the numerosity requirement is met.

Second, the Court notes that the parties' briefing almost exclusively concerns whether Plaintiffs have met the requirements for certification of the Class. Beyond offering their proposed definitions, Plaintiffs mention the subclasses only briefly in discussing numerosity and commonality. ECF No. 162 at 18.[3] Defendants similarly only mention the subclasses in the midst of arguments on the permissibility of certification for claims that require showings of reliance and causation. ECF No. 167 at 19–20. Following the parties, the Court focuses its analysis on certification of the Class and raises the subclasses only when relevant.

---

[3] Plaintiffs appear to offer new, alternative subclass definitions in their Reply. ECF No. 173 at 17 nn.7, 9. The Court addresses those proposals in the course of its analysis.

### A.  Commonality

Because Plaintiffs have satisfied Rule 23(a)(1)'s numerosity requirement, the Court turns to Rule 23(a)(2)'s requirement of commonality. As noted previously, the Rule requires a party seeking certification to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349 (quoting *Falcon*, 457 U.S. at 157). And the plaintiff's claims "must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

Plaintiffs assert that they have raised several questions capable of class-wide resolution. First, Plaintiffs claim that "Defendants promised that Xoom's variable energy rates would be consistently lower than customers' local utility rates, when in fact they were not." ECF No. 162 at 19. In a broader assertion of this claim, Plaintiffs contend that "Defendants jointly conspired to carry out the fraudulent scheme of marketing and selling Xoom's energy services using false representations." ECF No. 162 at 8. Related questions common to the class, Plaintiffs assert, include "the question of whether Xoom's variable pricing actually did or did not reflect wholesale market conditions," which XOOM allegedly claimed it did, and "the question of whether Xoom's alleged misconduct harmed the Classes." *Id.* at 19. Finally, Plaintiffs assert that "the issue of damages is also common to the class. The central question of how Defendants' violations damaged the class remains the same, and can be addressed by Plaintiffs' expert on a class-wide basis." *Id.*

It is apparent from this discussion that Plaintiffs' motion centers around the allegation that "Defendants," as part of a centrally directed scheme, made promises to prospective customers that changing their energy provider to XOOM would result in savings. The Court notes that Plaintiffs throughout this litigation have often referred vaguely to "Defendants" or "Xoom" as their opponents, apparently reflecting the notion advanced in Plaintiffs' Opposition to summary judgment that "XOOM Energy, XOOM State subsidiaries, and ACN act as one interrelated company when it comes to the methods and procedures with which they sold newly regulated home energy to consumers." ECF No. 131 at 5. In its decision granting summary judgment in part, the Court rejected this approach. ECF No. 175 at 19.[4]

Additionally, to support the central claim of the certification motion, Plaintiffs rely in part on allegations from their Second Amended Complaint. *See* ECF No. 162 at 8–9. As noted previously, however, Rule 23 "does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. Plaintiffs must "'be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Comcast Corp.*, 569 U.S. at 33 (quoting *Dukes*, 564 U.S. at 350). "The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.*

For record evidence, Plaintiffs' first point to deposition testimony from two former IBOs: Memi Oladapo, who testified that she attended IBO training sessions in Pennsylvania and Maryland where ACN representatives directed attendees to promise prospective customers that

---

[4] The Court also denied summary judgment in part on the finding that Plaintiffs had raised a genuine dispute as to whether the IBOs that promoted XOOM services to Plaintiffs had made actionable misrepresentations about savings. Under governing Maryland and New Jersey law, the Court concluded, Plaintiffs had raised a triable question about whether XOOM and ACN could be liable as principals for the alleged misrepresentations by the IBOs acting as their agents. ECF No. 175 at 22, 26–27.

they would save on energy costs and that their monthly rates would be lower if they switched to XOOM Energy, ECF No. 162-4 at 18–19;[5] and William Stracher, who testified that an unspecified individual told him that in working for ACN, his "future customers would save money" and he "would make a commission of selling," ECF No. 173-2 at 3.

Plaintiffs also discuss notes of customer complaint calls received by XOOM call centers between January 1, 2014 and June 30, 2014, records of which Plaintiffs obtained following a discovery dispute. ECF No. 162 at 13–14 (citing ECF No. 163-6); *see* ECF No. 162 at 9 n.4 (explaining that a set of complaint records attached to Plaintiffs' Motion is a sample of what Defendants produced). According to the notes, which were taken by XOOM customer service representatives, many callers stated in varying terms that while they were promised or guaranteed by ACN representatives that their energy prices would be the same or lower with XOOM or that they would save a certain percentage per month by switching, their bills instead exceeded what they paid to their local utility. *See* ECF No. 163-6 at 2, 3, 4, 8, 12, 14, 18, 22, 24, 29, 30, 31, 36, 40, 46, 47, 49, 50, 52, 53, 61, 62, 63, 68, 71, 74, 75, 76, 78, 79. XOOM's representatives often apologized for any "misinformation" provided by ACN representatives and informed callers that XOOM cannot "guarantee" savings over local utilities. *Id.* at 2, 3, 4, 5, 6, 7, 10, 13, 15, 18, 20, 22, 25, 26, 29, 31, 32, 33, 37, 39, 40, 42, 43, 44, 46, 48, 49, 50, 51, 52, 53, 57, 58, 61, 62, 63, 64, 68, 69, 73, 74, 75. Notably, a number of the calls came from ACN IBOs who indicated that they were told their customers would save money with XOOM or were otherwise frustrated with XOOM's pricing compared to local utilities. *Id.* at 24, 33, 41, 48, 49, 64, 68, 77.

---

[5] While Plaintiffs presented this evidence in opposition to summary judgment as well, Oladapo also testified that she did not know and had no connection to any of the individual Plaintiffs, nor to any of the IBOs who promoted XOOM services to them, none of whom testified that they attended such trainings. ECF No. 133-2 at 7–12. The Court accordingly found Oladapo's testimony irrelevant, or at least inadequate to raise a genuine dispute on any of the issues raised by Defendants' motion in the absence of additional evidence. ECF No. 175 at 15 n.5.

There is a substantial variation in the language of the promises or guarantees that the customers claim were made to them, as related to and recorded by the customer service representatives. For example, many callers stated that they were promised "savings" generally, *see, e.g.*, *id.* at 2, 3, 4, 8, while others claimed to have been guaranteed a specific percentage range by which their bills would be reduced, *see, e.g.*, *id.* at 2, 8, 39, 40, while still others said they were promised specific rates per unit of energy, *see, e.g.*, *id.* at 6. Nonetheless, there is undoubtedly a common thread running through the complaints: prospective customers were told that they would save on their energy bills if they switched to XOOM, but those savings did not materialize. Further, these accounts are consistent with the testimony of the individual Plaintiffs that they were made promises of savings that were broken when their bills instead increased. While the customer complaints are not direct evidence of a centrally directed plan by XOOM and ACN to entice potential subscribers with false promises of savings, their volume and broad similarity produces the distinct impression that the shared experiences of Plaintiffs and the many complaining customers are not coincidental.

Examining the calls from IBOs who themselves believed that switching to XOOM would result in savings strengthens this impression. For example, in a call record dated March 5, 2014, a caller stated that he and his wife "are ACN" and were "always told xoom will be cheaper. ALWAYS!" *Id.* at 33. A record dated April 1, 2014 states that the caller was "extremely upset due to receiving the incorrect information upon signing up for ACN," stated that her "ACN mentor told her to sign people up and keep it brief so the consumers do not ask questions," and asked to cancel her own XOOM account "due to price." *Id.* at 49. A third caller on April 25, 2014 "said he was an ACN rep. and started asking about why our prices are higher than the utility." *Id.* at 64. A fourth caller on May 6, 2014 provided his ACN IBO identification number

and stated that "he was told an ESCO is always 3-7% lower than the utility." *Id.* at 68.[6] These accounts are consistent with the testimony of Oladapo and Stracher, suggesting that at least some IBOs were told, and in turn told prospective customers, that switching to XOOM from a local utility would result in savings.[7]

Defendants argue that the customer complaint records are inadmissible hearsay and are therefore improper for the Court to consider in weighing class certification. ECF No. 167 at 26–27 & n.4. Defendants cite no authority for this argument beyond the Federal Rules of Evidence, however, and as one of the leading treatises on class actions explains, "[c]ourts have not achieved consensus on whether only evidence that is admissible under the Rules of Evidence may be considered in deciding whether a class may be certified." 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 3:12 (16th ed. Oct. 2019 update) (collecting cases taking differing positions). The Fourth Circuit does not appear to have expressed a view on this issue, but at least one district court within the circuit has found that evidence that would be inadmissible at trial may nonetheless be considered in deciding on class certification. *Brandriff v. Dataw Island Owners' Ass'n, Inc.*, No. 9:07-3361-CWH, 2010 WL 11534520, at *6 (D.S.C. Aug. 6, 2010). Conversely, another district court found that the Federal Rules of Evidence do apply at the class certification stage and accordingly rejected an affidavit that was based on insufficient personal knowledge to satisfy Rule 602. *Soutter v. Equifax Info. Servs. LLC*, 299 F.R.D. 126, 129–33 (E.D. Va. 2014).

---

[6] An "ESCO" is a third-party energy services company like XOOM Energy. See *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 174 (2d Cir. 2019).

[7] The Court notes Defendants' objection that Oladapo is not a credible witness because she is a personal friend of one of Plaintiffs' attorneys, has family members who have been involved in similar prior litigation, and had difficulty recalling details of the events she described in her deposition. ECF No. 167 at 35–36. Defendants point to no authority indicating that the Court should engage in credibility determinations at this stage, however, and the Court will decline to do so. Even if the Court disregarded Oladapo's testimony, however, the Court's conclusions with respect to commonality would not be disturbed in light of the remaining evidence Plaintiffs have offered.

Courts faced with hearsay objections to evidence presented in support of class certification have analyzed the applicability of the Federal Rules of Evidence to varying degrees. Among the most comprehensive analyses is by Judge Browning of the U.S. District Court for the District of New Mexico in *Zuniga v. Bernalillo County*, 319 F.R.D. 640, 660 & n.5 (D.N.M. 2016). Following an extensive review of the evidence rules and competing precedents, Judge Browning concluded that "[i]n taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion." *Id.* at 660. Noting that Rule 1101(d)(1) makes the Rules applicable to "civil cases and proceedings," Judge Browning concluded that a class action is of course a civil case and does not naturally fall under any of the Rule's exceptions. *Id.* at 660 n.5. Judge Browning also observed that class certification is an important stage of a case because it determines whether the cost of a potential settlement is determined by the value of a small number of individual claims or instead of a much more expansive class. *Id.*

Despite these indications that full application of the Rules is justified, Judge Browning reasoned that a "relaxed" approach was warranted:

> On the other hand, the sole decider in class certification hearings is a judge, and not a jury. Judges may be better equipped to properly weigh the value of hearsay and irrelevant evidence than juries. Moreover, there is no practical way to screen a presiding judge entirely from hearing inadmissible evidence, as it is the judge who must decide the threshold question of admissibility. It is, thus, perhaps more realistic and more honest for the judge to consider all but the most egregiously inadmissible pieces of evidence as they are presented, and factor any evidentiary infirmity into the weight he or she gives to them.

*Id.* The Court finds this "relaxed" approach reasonable and persuasive. *Id.* at 660. The Court would add to Judge Browning's thoughtful analysis that it seems to make little practical sense to constrain the body of facts before the Court at this stage on the basis of rules meant to avoid presenting a jury with unreliable testimony at trial. Class representative plaintiffs undoubtedly

bear the burden of setting forth admissible evidence if and when their case is set for trial. But in considering whether to certify a class, a decision that "is far from a conclusive judgment on the merits of the case," courts seem adequately equipped to determine whether plaintiffs have met the requirements of Rule 23 with sufficiently reliable evidence. *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011).

It also bears noting that many decisions finding that the Federal Rules of Evidence should apply at this stage are concerned with the risks of approving a class action on the basis of unscientific expert testimony or affidavits lacking personal knowledge. *See, e.g.*, *Soutter*, 299 F.R.D. at 129–33; 1 McLaughlin § 3:12 & nn. 83–84 (collecting cases). Here, in contrast, the challenged materials are records of customer complaints that were produced by Defendants in discovery and were originally recorded by XOOM customer service staff. Additionally, the promises and guarantees related by the complaining customers were made by IBOs, whom the Court has concluded could be considered Defendants' agents, potentially rendering their statements admissible under Rule 801(d)(2)(D). *See* ECF No. 175 at 22, 26–27. Defendants also concede that the complaint records, if not the statements they contain, are subject to the business records exception to the prohibition on hearsay. ECF No. 167 at 27 n.4 (citing Fed. R. Evid. 803(6)). In short, several features of the complaints mitigate the reliability concerns that motivate the general prohibition on admitting hearsay. For these reasons, the Court concludes that the complaints are not among "the most egregiously inadmissible pieces of evidence" that *Zuniga* cautioned against considering even under its "relaxed approach." 319 F.R.D. at 660.

To be sure, even taking the customer complaints into account, Plaintiffs' evidence in support of their central common allegation is not overwhelming. It bears mention that after many years of filings insisting that it exists, Plaintiffs have apparently failed to obtain or present direct

evidence indicating deliberate decisionmaking by XOOM and ACN to systemically train IBOs to falsely promise savings. The only internal document that Plaintiffs cite in support of class certification is an apparent XOOM training slide stating that with variable rate plans, XOOM may offer the "[l]owest possible cost that current market allows." *See* ECF No. 173 at 10; ECF No. 131-15. However, as Defendants noted in responding to Plaintiffs' citation of this slide at the summary judgment stage, the document also expressly states that "XOOM cannot guarantee our variable rates would save you money." ECF No. 133 at 9 (citing ECF No. 131-15). Plaintiffs' citation to the slide as evidence that Defendants trained IBOs to promise savings thus appears mistaken; at best, the slide only weakly supports Plaintiffs' assertions. Notably, other XOOM training materials explicitly state that IBOs may not promise or guarantee savings to potential customers. *See* ECF No. 122-4 ¶¶ 38–41; *see also id.* at 31, 34, 37.[8]

Plaintiffs' central claim thus rests largely on circumstantial evidence. And Plaintiffs certainly overstate the strength of that evidence at times, including in claiming it establishes that "Defendants uniformly marketed and promoted to each Class member that by switching to XOOM Energy from their local utility, they would consistently save money on their energy bills." ECF No. 173 at 6–7. Still, the evidence Plaintiffs have offered – the testimony of the individual Plaintiffs indicating similar experiences with IBOs, the accounts of Oladapo and Stracher that they were told that XOOM customers would enjoy savings, and XOOM customers' complaints that they were made such promises and they were broken – combines to form a foundation, if not the sturdiest one, for a class action to answer to the common question of

---

[8] In its Memorandum Opinion concerning summary judgment, the Court noted an ACN document stating that it is "acceptable" for IBOs to say that "[c]ustomers will receive the same or better pricing by switching to ACN." ECF No. 175 at 33; *see* ECF No. 131-14 at 12. Plaintiffs have not pointed to the document here, however. Because the Court concludes that Plaintiffs have adequately demonstrated commonality, the Court notes the document for consistency with its prior ruling but need not address it further.

whether XOOM Energy and ACN conspired to falsely promise savings to potential customers. And answering that question would "resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Accordingly, the Court concludes that Plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).

### B.  Typicality

The Court next considers whether the individual Plaintiffs' claims are typical of the claims of the class pursuant to Rule 23(a)(3). As the Fourth Circuit has explained, "[t]he typicality requirement goes to the heart of . . . representative parties' ability to represent a class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (citing *Amchem Prods., Inc.*, 521 U.S. at 626 n. 20). While typicality does not require that "the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned," the plaintiff's claim "cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Id.* at 467. In other words, "when the variation in claims strikes at the heart of the respective causes of actions," class certification should be denied. *Id.*

Plaintiffs assert that "[a]ll of the class members were subject to Defendants' uniform representations and practices concerning its variable rate pricing and suffered the same overcharge injuries," rendering the individual Plaintiffs' claims "not only typical of the claims of putative class members, but . . . essentially identical to them." ECF No. 162 at 21. But these statements are inconsistent with the maximally broad class definitions that Plaintiffs have proposed. As described previously, the Class is defined as including *all* current or former subscribers of variable rate XOOM Energy plans for natural gas or electricity in eighteen states, while the two subclasses include the New Jersey and Maryland residents in the Class. ECF No.

18

161. As Defendants correctly observe, however, that definition sweeps well beyond the claims of the individual Plaintiffs. ECF No. 167 at 21–24. Plaintiffs' claims are each based on alleged misrepresentations by IBOs that Plaintiffs say were directed by XOOM Energy and ACN. But as Defendants demonstrate with uncontroverted evidence, customers can enroll with XOOM directly through its website and therefore need not have had any interaction with an IBO to subscribe. *Id.* at 21 (citing ECF No. 167-5 ¶ 7).[9]

It is also more than plausible that some customers in the prospective class enrolled with XOOM after speaking with IBOs who did not make the type of misrepresentations at the heart of Plaintiffs' claims. Indeed, many of the customer complaints that Plaintiffs have presented express unhappiness about XOOM pricing but make no mention of promises of savings. *See, e.g.*, ECF No. 163-5 at 22. And Plaintiffs have not shown that there were no prospective class members who were pleased with the pricing XOOM offered, or who at least found it consistent with representations made to them by IBOs. In short, Plaintiffs have offered insufficient evidence to demonstrate that all members of the Class relied on the same type of IBO misrepresentations about savings as Plaintiffs and accordingly have similar claims.

Plaintiffs therefore do not appear to have shown that their claims are typical of the claims of prospective class members. Rather, Plaintiffs' claims seem to be typical only of other variable rate customers who, like Plaintiffs, became subscribers in reliance on misrepresentations by IBOs and were dissatisfied when their energy bills increased. There are some indications in Plaintiffs' briefing that the class definitions are drawn as broadly as they are because Plaintiffs

---

[9] In addition to describing this variation among class members, Defendants attempt to undermine the merits of Plaintiffs' claims by arguing that both XOOM's website and terms and conditions documents emailed to new customers state that variable rate customers may pay higher rates than those charged by local utilities. ECF No. 167 at 21 (citing ECF No. 122-4 ¶¶ 16–17, 22). However, the Court's ruling on summary judgment expressed skepticism about whether the inclusion of terms on XOOM's website or in an enrollment email could negate prior oral misrepresentations under Maryland law, and the Court sees no need to revisit that issue now. *See* ECF No. 175 at 45–49.

believe XOOM unlawfully overcharged all of its customers. But the central component of each of the claims Plaintiffs have asserted is that Defendants, through IBOs, wrongfully induced customers to enroll with XOOM using illusory and false promises of savings. Plaintiffs have advanced no claims that if proven would render XOOM and ACN liable merely for charging customers more than their local utilities.

As a result, Plaintiffs have failed to demonstrate that they "suffer[ed] the same injury" as the prospective class members, which they must in order to satisfy the typicality requirement. *Lienhart*, 255 F.3d at 146 (quoting *Falcon*, 457 U.S. at 156). And the same conclusion applies to the subclasses, which purport to include all New Jersey and Maryland variable rate customers. The Court is thus faced with two options: find that Plaintiffs have failed to satisfy the typicality requirement, or exercise the Court's discretion to modify the class definition to align with Plaintiffs' claims. *See Piotrowski v. Wells Fargo Bank, NA*, No. DKC 11-3758, 2015 WL 4602591, at *5 (D. Md. July 29, 2015) (collecting cases describing this discretion); *see also Sanders v. Gladiator, Inc.*, No. 5:08-CV-555-FL, 2010 WL 11619711, at *3 n.5 (E.D.N.C. Apr. 12, 2010) (collecting cases); 3 William B. Rubinstein, Newberg on Class Actions § 7:27 (5th ed. June 2020 update) (noting that "several circuits have held that a court should alter the class definition in lieu of rejecting class certification, if possible").

The Court could exercise its discretion and modify the proposed class definition to match Plaintiffs' remaining claims. The class definition might consist of "all persons in California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Texas, Virginia who changed their electricity or natural gas supplier to a XOOM Energy subsidiary following a promise or guarantee by an IBO that they would experience savings as compared to their local

utility." The New Jersey and Maryland Subclasses would be modified correspondingly, consisting of all XOOM subsidiary customers in those states who changed their energy supplier following a promise or guarantee of savings by an IBO. But while these definitions might remedy Plaintiffs' typicality issues, the Court will decline to direct these modifications because of further barriers to certification, as the Court details in the following sections.

### C. Adequacy

"The adequacy of representation element requires both the class representatives and the class attorney to adequately represent the class." *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 472 (D. Md. 2002); *see also* Fed. R. Civ. P. 23(g). "To satisfy Rule 23(a)(4), a class representative must, among other factors, be of a character to vigorously pursue the case." *Monroe v. City of Charlottesville*, 579 F.3d 380, 385 (4th Cir. 2009). "Findings that a representative lacks sufficient interest, credibility, or either knowledge or an understanding of the case—although a knowledge or understanding of all the intricacies of the litigation is not required—are grounds for denying class certification." *Id.* "The analysis is intended 'to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney.'" *Id.* (quoting 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1766 (3d ed. 2005)).

Citing their depositions, Defendants attack Plaintiffs' adequacy as class representatives on several of these grounds. ECF No. 167 at 41–42. As Defendants accurately recount, Bonicos testified that he had not read the Second Amended Complaint, did not know who Elizabeth Donnellon was, was not aware of any Defendants besides "XOOM Energy," did not know of any of the claims alleged in the lawsuit, did not know where the suit was filed or what his role in it was, did not know what the role of class representative entailed, and had only spoken with his

counsel approximately once per year. ECF No. 167-3 at 3–4, 6–8. Similarly, Donnellon testified

that she did not remember if she had read the Second Amended Complaint, was not aware of any

Defendants besides "XOOM Energy," was not familiar with the claims that had been alleged,

was unable to explain what a class action was or the difference between a class action and an

individual lawsuit, did not know why Blaine Donnellon was not a defendant, and had

communicated with her lawyers only four times between the filing of the suit and her deposition

and had only met them for the first time that day. ECF No. 167-4 at 3–6, 16–18.

Finally, Todd testified that he "assum[ed] Xoom Energy" was the defendant in the case,

did not know what claims had been alleged, answered "I don't know" when asked if he

understood what his role in the case would be, and "[p]artly" knew what his duties and

obligations as a class representative were. ECF No. 167-2 at 3, 7. Though Todd expressed some

understanding of class action litigation, *see id.* at 6, like Bonicos he testified that he had spoken

with his attorneys approximately once per year, *id.* at 9. Plaintiffs respond to Defendants'

citation of this testimony by stressing that Plaintiffs do not have antagonistic interests to the class

or other conflicts that would render them inadequate representatives. ECF No. 173 at 20.

To Defendants' assertion that Plaintiffs are not adequate representatives because of their

lack of knowledge and understanding of their case, Plaintiffs state only that "[t]he representatives

are poised to vigorously litigate on behalf of the entire Class." ECF No. 173 at 21. But Plaintiffs'

testimony about their knowledge of the case and interactions with their attorneys casts significant

doubt on that unsupported assertion. While the Court does not find this issue so pressing as to be

dispositive, it nonetheless adds further weight against certification.

Defendants also argue that Plaintiffs' proposed class counsel are not adequate to

represent the interests of the proposed Class. ECF No. 167 at 38–40. Federal Rule of Civil

Procedure 23(g) provides that in appointing class counsel, courts "must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Defendants argue that Plaintiffs' counsel are inadequate mainly on the ground that a court rejected some of the same attorneys as class counsel in a suit against an energy supplier similar to XOOM Energy. ECF No. 167 at 38–40 (citing *Oladapo v. Smart One Energy, LLC*, No. 14-CV-7117 (LTS) (BCM), 2017 WL 5956907, at *10 (S.D.N.Y. Nov. 9, 2017).

As Plaintiffs correctly respond, however, the court's objection in that case concerned a provision of a proposed settlement that would have "pit[ted] the financial interests of Class Counsel squarely against the financial interests of the Class they propose[d] to represent." *Oladapo*, 2017 WL 5956907, at *10. No such conflict is present in this case, however, and Defendants fail to explain how that case-specific issue bears on the adequacy of class counsel here. Instead, Defendants make broad insinuations about Plaintiffs' counsel's competence, noting that another proposed class action brought by Plaintiffs' counsel against an energy supplier was dismissed, and contending that "it took Plaintiffs' counsel *four* attempts just to file the operative Complaint in this case." ECF No. 167 at 39–40 (citing *Daniyan v. Viridian Energy LLC*, No. GLR-14-2715, 2015 WL 4031752 (D. Md. June 30, 2015) (emphasis in original).

The Court finds these arguments unnecessary and unhelpful. As Plaintiffs respond, Plaintiffs' counsel's firms have successfully litigated several consumer class actions. ECF No. 173 at 21–24 (citing and describing a sample of prior cases). Counsel have also ably engaged in motion practice and discovery disputes over the course of this litigation. The Court's

observations in this matter, along with Plaintiffs' counsel's record, satisfy the Court that Plaintiffs' counsel are "qualified, experienced and able to conduct the litigation." *Cuthie v. Fleet Reserve Ass'n*, 743 F. Supp. 2d 486, 499 (D. Md. 2010) (citing *Mitchell-Tracey*, 237 F.R.D. at 558). Accordingly, the adequacy of proposed class counsel would not be an obstacle to certification were it otherwise justified.

### D. Predominance

The Court next considers the predominance requirement of Rule 23(b)(3), the subject of most of Defendants' meritorious objections to certification.[10] As the Fourth Circuit and the U.S. Supreme Court have explained, "Rule 23(b)(3)'s predominance requirement is 'far more demanding' than Rule 23(a)'s commonality requirement and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004) (quoting *Amchem Prods., Inc.*, 521 U.S. at 623–24). Defendants raise three predominance-related objections to certification: that the law governing Plaintiffs' common law claims is sufficiently variant between the states at issue that a class action would not be manageable; that the types of claims Plaintiffs raise are not properly resolved on a class-wide basis; and that the individualized nature of Plaintiffs' alleged damages precludes certification. The Court considers each of these arguments in turn.

### 1. Governing Law

As discussed previously, five claims against XOOM Energy and ACN remain in this action: Plaintiff Donnellon's common law fraud claim and Maryland Consumer Protection Act claim, and the New Jersey Plaintiffs' common law fraud and negligent misrepresentation claims

---

[10] Though Rule 23(b)(3) also requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," the parties only mention the superiority requirement in passing, and the Court accordingly focuses on predominance.

and claims under the New Jersey Consumer Fraud Act. *See* ECF No. 176. According to

Defendants, certification of an eighteen-state class for the common law claims would be

improper because of material variations of law across the different states. ECF No. 167 at 14. "In

a class action potentially governed by the laws of multiple states, identifying the applicable body

or bodies of state law is critical because 'variations in state law may swamp any common issues

and defeat predominance.'" *Ward v. Dixie Nat'l Life Ins. Co.*, 257 F. App'x 620, 628–29 (4th

Cir. 2007) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996)).

"[P]laintiffs have the burden of showing that common questions of law predominate, and

they cannot meet this burden when the various laws have not been identified and compared."

*Gariety*, 368 F.3d at 370. As Defendants correctly observe, Plaintiffs' certification motion does

not discuss the relevant law of the eighteen states included in Plaintiffs' proposed class. ECF No.

167 at 15. "When a plaintiff seeking certification fails to provide this analysis, it is not possible

for the district court to determine whether any variations in state law 'pose insuperable obstacles

to certification' of a multistate class," and denial of certification for a multistate class is

warranted. *Ward*, 257 F. App'x at 629 (quoting *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 313

(5th Cir. 2000)).

Plaintiffs respond to Defendants' arguments on this issue in their Reply, contending that

"courts routinely certify multistate common law fraud class actions" and that "[t]he elements of

common law fraud are effectively identical across jurisdictions where Defendants supplied

energy." ECF No. 173 at 16 & n.6. Plaintiffs cite case law from each of the eighteen states and

offer a table of quotations from the cases that set out the elements of fraud in each jurisdiction.

ECF No. 173 at 16 n.6; ECF No. 173-4. Without individually describing the substantive law of

each state here, the Court is satisfied that the common law of fraud is sufficiently similar in each jurisdiction to avoid defeating predominance.

The Court is not the first to make this finding with respect to fraud. For example, in *Spencer v. Hartford Financial Services Group, Inc.*, Judge Hall of the U.S. District Court for the District of Connecticut found that "[v]irtually every state requires that there be a misrepresentation made by the defendant, that the defendant had knowledge that it was false, the defendant intended to induce the reliance of the plaintiff, the plaintiff relied on the statement, and the plaintiff was injured as a result." 256 F.R.D. 284, 301 (D. Conn. 2009). Importantly, Judge Hall noted that while "[s]ome states allow fraud claims where the falsity of the representation was made with reckless indifference to the truth, even if the falsity was not known to the defendant," that distinction was immaterial in *Spencer* because the plaintiffs there "rest[ed] their fraud claim on a knowing false representation." *Id.* at 301 n.6. Because the plaintiffs had "not offered a theory of proof relying on reckless indifference of the falsity of the representation," the court did not need to "further consider this issue." *Id.*

The Court here reaches the same conclusions with respect to fraud that Judge Hall made in *Spencer* and that other courts have reached in weighing the same issue. *See, e.g.*, *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 570 (S.D.N.Y. 2014). Importantly, as in *Spencer*, Plaintiffs' theory of fraud rests on allegations of knowing false representations about savings that would result from switching to XOOM Energy. Accordingly, while Defendants raise the "reckless indifference" distinction between different states' fraud law as an objection, that argument is unpersuasive. Defendants also argue that states differ on the standard of proof for fraud claims and on the showing required to establish justifiable reliance. ECF No. 167 at 16. But *Spencer* considered and rejected similar objections, finding that "because the underlying

factual proof is the same, these differences could be adequately addressed with a verdict form and do not defeat predominance." 256 F.R.D. at 301. The Court finds that analysis persuasive and accordingly rejects Defendants' fraud-based arguments challenging predominance.

Plaintiffs have not responded to Defendants' arguments with respect to state variations as to negligent misrepresentation claims, however. Instead, a footnote in Plaintiffs' Reply states, for the first time, that "Plaintiffs are seeking to certify a New Jersey subclass for its [sic] negligent misrepresentation claim." ECF No. 173 at 17 n.7. Plaintiffs thus appear to have abandoned their attempt to assert the negligent misrepresentation claim on behalf of the multistate Class. The Court thus need not consider this issue further, although the Court notes Defendants' cogent observation that the Court dismissed Plaintiff Donnellon's Maryland negligent misrepresentation claim while allowing the New Jersey Plaintiffs' claim to proceed because of meaningful differences in the law between the two jurisdictions. *See* ECF No. 67 at 18–20. Thus, if Plaintiffs had sought to assert the negligent misrepresentation claim on behalf of the Class, the Court would need only look to its prior decision to find that the law of the states in the Class is too divergent to support predominance. [11]

### 2. Reliance and Causation

Defendants next argue that certification is inappropriate because Plaintiffs' claims require individualized showings of reliance and causation. ECF No. 167 at 17. Defendants cite and extensively draw on the Fourth Circuit's decision in *Broussard v. Meineke Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998). In *Broussard*, ten franchisees sued their franchisor and related

---

[11] In an additional footnote in their Reply, Plaintiffs state that in the alternative to an eighteen-state fraud class, "Plaintiffs seek certification of Maryland and New Jersey fraud subclasses." ECF No. 173 at 17 n.9. Plaintiffs thus appear to request that if the Court finds that the common law of fraud is too divergent across the Class states to allow certification, Plaintiffs essentially seek to abandon all of the states in the Class except for Maryland and New Jersey. Because the Court has found no such issue with respect to fraud, however, the Court need not consider Plaintiffs' proposition further.

entities claiming that the franchisor breached agreements and made misrepresentations about an advertising account funded by franchisee contributions, thereby giving rise to tort claims including fraud, negligent misrepresentation, and violation of the North Carolina Unfair Trade Practices Act. *Broussard*, 155 F.3d at 334–35. After the district court certified a nationwide class of franchisees, the case proceeded to a jury trial, the defendants were found liable, and the court entered a judgment of over $590 million for the plaintiffs. *Id.* at 336–37.

On appeal, the Fourth Circuit reversed the district court's certification of the class. Among other issues with certification, the Fourth Circuit found that "the reliance element of plaintiffs' fraud and negligent misrepresentation claims were not readily susceptible to class-wide proof." *Id.* at 341. Because under North Carolina law "these claims turn[ed] on whether each franchisee reasonably relied on [the franchisor's] representations," the court reasoned, "proof of reasonable reliance would depend upon a fact-intensive inquiry into what information each franchisee actually had about the operation" of the franchisor's advertising account. *Id.* That information could have come from conversations with representatives of the franchisor or with other franchisees, franchisees' independent legal analysis of the governing contract, audit statements of the account, and other sources, the Fourth Circuit found. *Id.*

The Fourth Circuit then favorably cited case law from the Sixth Circuit stating that "claims that 'require[ ] proof of what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on those statements to his detriment' are not susceptible to class-wide treatment." *Id.* at 342 (alteration in original) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998)). Concluding, the Fourth Circuit "agree[d] that because reliance 'must be applied with factual precision,' plaintiffs' fraud and negligent misrepresentation claims do not provide 'a suitable basis for class-wide

28

relief.'" *Id.* (quoting *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 953 (8th Cir. 1994)). In a subsequent case, *Gariety v. Grant Thornton, LLP*, the Fourth Circuit drew on *Broussard* and additional case law for similar principles, explaining that "[b]ecause proof of reliance is generally individualized to each plaintiff allegedly defrauded, fraud and negligent misrepresentation claims are not readily susceptible to class action treatment, precluding certification of such actions as a class action." 368 F.3d at 362 (citation omitted); *see also id.* at 370 (explaining that "individual inquiries into reliance typically preclude a finding that common issues of fact predominate").

This controlling case law present a substantial obstacle to certification here because an essential element of Plaintiffs' claims is that prospective class members relied on representations of savings made by different, individual IBOs. Plaintiffs protest that *Broussard* is distinguishable because the alleged misrepresentations made to the plaintiffs there "varied materially" in a way that precluded certification. ECF No. 173 at 7–8 (citing *Broussard*, 155 F.3d at 342–44). In contrast, Plaintiffs argue, "there are no material differences" among the alleged oral misrepresentations made to prospective class members, who "all were promised that their energy bills would be cheaper by switching to Xoom, and all ended up with higher energy bills than they would have had if they had stayed with their local utility." *Id.* at 8.

While that contention and the customer complaint calls supporting it may be sufficient to demonstrate commonality, it cannot satisfy the "far more demanding" predominance requirement. *Gariety*, 368 F.3d at 362 (quoting *Amchem Prods., Inc.*, 521 U.S. at 624). Plaintiffs insist that "Xoom representatives uniformly promised Plaintiffs and putative Class members savings that induced them to switch from their public utility company." ECF No. 173 at 15. But as the Court has described, Plaintiffs lack support for their claim that the promises were made "uniformly." *Id.* While the customer complaints do indicate a pattern of promises of savings, that

29

alone does not render the alleged misrepresentations sufficiently uniform to enable determination of reasonable reliance on a class-wide basis. As the Court has noted, some of the complaining customers stated they were made general promises of "savings," while others claimed to have been guaranteed a specific percentage decrease in their bills, while others believed they would be charged specific rates. *See* ECF No. 163-6 at 2, 3, 4, 6, 8, 39, 40.

Such variation necessitates individualized inquiries, a conclusion strengthened by the fact that Plaintiffs also had differing personal relationships with the IBOs who marketed XOOM services to them. *See Metz v. Unizan Bank*, No. 5: 05 CV 1510, 2009 WL 10713772, at *4 (N.D. Ohio Mar. 24, 2009) (denying class certification on fraud claims in part because agents and representatives who made allegedly fraudulent representations on the defendant's behalf "may have had a vastly different type of relationship with each of the individual plaintiffs"). As the Fourth Circuit explained in *Broussard*, "claims that 'require[ ] proof of what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on those statements to his detriment' are not susceptible to class-wide treatment." 155 F.3d at 342 (alteration in original) (quoting *Sprague*, 133 F.3d at 398); *see also Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006) (explaining that "in cases where the legal issue is . . . focused on the plaintiff's knowledge, such as the requirement that a plaintiff in a fraud claim reasonably rely on the defendant's representations, we have consistently held that individual hearings are required").

And though Plaintiffs draw some factual distinctions between this case and *Broussard*, they cannot escape that a core element of nearly all of their claims is a showing of justifiable reliance on the alleged IBO misrepresentations. With respect to fraud – for which Plaintiffs have argued that the law is consistent across the eighteen states in the Class – Maryland law is clear

that plaintiffs "must show that they reasonably relied to their detriment on some promise or misrepresentation." *Green v. Wells Fargo Bank, N.A.*, 927 F. Supp. 2d 244, 253 (D. Md. 2013) (citing *Goss v. Bank of Am., N.A.*, 917 F. Supp. 2d 445, 451 (D. Md. 2013)). With respect to negligent misrepresentation claims – the cross-jurisdictional consistency of which Plaintiffs have not addressed – New Jersey law also requires "reasonable reliance" on a "material misrepresentation." *Hurdleston v. New Century Fin. Servs., Inc.*, 629 F. Supp. 2d 434, 443 (D.N.J. 2009) (citing *Kaufman v. i-Stat Corp.*, 754 A.2d 1188 (N.J. 2000)).

As a result, under the principles articulated in *Broussard* and its progeny, Plaintiffs cannot satisfy the Rule 23(b)(3) predominance requirement with respect to their common law fraud and negligent misrepresentation claims. And the same conclusion applies to Plaintiff Donnellon's claim under the Maryland Consumer Protection Act, which similarly requires a showing of reasonable reliance on an alleged misrepresentation. *Green*, 927 F. Supp. 2d at 253 (citing *Goss*, 917 F. Supp. 2d at 451). As for the New Jersey Plaintiffs' New Jersey Consumer Fraud Act ("NJCFA") claim, Defendants correctly concede that a showing of reliance is not a required element. A plaintiff need only demonstrate "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009).

As Defendants also note, however, New Jersey federal courts have repeatedly found predominance issues with NJCFA class claims stemming from the causation element and the individualized inquiry it demands into the decisionmaking of each allegedly defrauded consumer. For example, the court in *Donachy v. Intrawest U.S. Holdings, Inc.* explained that it was "highly skeptical of the suitability" of NJCFA claims "for class treatment" because "[t]o the extent Plaintiff relies on claims of misrepresentation by Defendants in non-standardized

31

communications, the alleged misrepresentations will require individualized proof." No. 10-4038 (RMB/KMW), 2012 WL 869007, at *10 (D.N.J. Mar. 14, 2012) (collecting cases). Similarly, in *Demmick v. Cellco Partnership*, the court declined to certify an NJCFA class on predominance grounds because "like with the reliance element for common law fraud, it is hard to evaluate what factors caused each proposed class member's loss where some of the plaintiffs made their decisions based on oral representations that may have varied." No. 06-2163 (JLL), 2010 WL 3636216, at *17 (D.N.J. Sept. 8, 2010). "Although the proof required for the causation element of a NJCFA claim may be less stringent than for reliance," the court reasoned, "it is hard to imagine that any causal connection for this claim could be established absent resort to individualized evidence." *Id.*

Defendants' citation to this New Jersey case law, to which Plaintiffs have not responded, is persuasive and aligns with the Fourth Circuit's approach to similar claims. Plaintiffs instead urge the Court to look to approaches taken by other circuits, particularly the Ninth Circuit in *In re First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006). The court there explained, drawing on a decision from the U.S. District Court for the District of Arizona, that "[c]lass treatment has been permitted in fraud cases where . . . a standardized sales pitch is employed," even when the "'fraud is consummated principally through oral misrepresentations.'" 471 F.3d at 991 (quoting *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 430 (D. Ariz. 1992)). The Ninth Circuit favorably cited the Arizona district court's explanation that where there is evidence of a "centrally orchestrated strategy . . . [t]he exact wording of the oral misrepresentations . . .  is not the predominant issue" and "[i]t is the underlying scheme which demands attention." *Id.* (quoting *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. at 430–31).

Whatever the wisdom of this approach, however, it is not the law of the Fourth Circuit. Notably, as Defendants observe, the Ninth Circuit acknowledged in *First Alliance* that "some other courts have adopted somewhat different standards in identifying the degree of factual commonality required in the misrepresentations to class members in order to hold a defendant liable for class-wide fraud." *Id.* at 990. Plaintiffs challenge Defendants' analysis of specific features of *First Alliance* that Defendants argue distinguish it from the present case. But whatever parallels exist between *First Alliance* and this case, *First Alliance* cannot displace *Broussard* and subsequent Fourth Circuit rulings as the law controlling the Court's decision. Nor can a number of other out-of-circuit decisions on which Plaintiffs draw in asserting that "[s]imilar cases are regularly certified." ECF No. 162 at 24–25. While Plaintiffs point to two cases from this district in which certification motions were granted, neither significantly support Plaintiffs.

First, in *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492 (D. Md. 1998), the court certified a class of mortgage borrowers asserting federal Fair Debt Collection Practices Act claims. The court rejected the defendants' argument that the need to examine each class member's claims individually defeated Rule 23(a)(2) commonality because "each class member had a mortgage agreement that Defendant may have violated by sending the same, standard, notice." *Id.* at 498. "The virtually identical nature of the notices," as well as other factors, "vitiated any need to analyze each class member's individual claim." *Id.* While the Court in this case has recognized that the customer complaints Plaintiffs have offered provide slight circumstantial support for the notion of a centrally directed sales strategy, the misrepresentations related in the complaints cannot fairly be characterized as "virtually identical." *Id.* And the class

claims in *Peoples* did not involve oral misrepresentations or require any showing of justifiable reliance. Accordingly, *Peoples* does not support Plaintiffs' effort to satisfy predominance here.

Nor does the additional case Plaintiffs cite, *Mitchell-Tracey v. United General Title Insurance Co.*, 237 F.R.D. 551 (D. Md. 2006). There, proposed class representatives alleged that the defendant insurance companies collected title insurance premiums higher than the amount authorized by state law. *Id.* at 553. While the actual premium amount paid by each potential class member differed, the central issue was simply whether the rate charged exceeded the authorized amount. *Id.* at 557. Additionally, "[d]efendants allegedly utilized standardized forms, processes and practices," and discovery had revealed that, "as to all proposed class members, the Defendants' alleged procedures, protocols, written guidelines and lack of oversight of their Maryland agents . . . [did] not vary in any material manner." *Id.* Further, *Mitchell-Tracey* did not turn on questions of justifiable reliance on misrepresentations, and the court only considered the uniformity of the defendants' practices with respect to commonality and typicality rather than the more demanding predominance requirement. *See id.*

Thus, neither case helps Plaintiffs to demonstrate predominance here. Notably, *Peoples* preceded *Broussard*, and *Mitchell-Tracey* did not engage with *Broussard* or its progeny. Accordingly, even if the decisions were more supportive of Plaintiffs' position, Fourth Circuit case law would nonetheless control. And Defendants' persuasive arguments citing those precedents further reduce the certifiability of the proposed Class and subclasses.

### 3. Damages

Finally, Defendants argue that the individualized nature of Plaintiffs' purported damages precludes certification. ECF No. 167 at 28. As Defendants correctly note, the Supreme Court has found that "[q]uestions of individual damage calculations" may in some cases "overwhelm

questions common to the class." *Comcast Corp.*, 569 U.S. at 34. The Fourth Circuit has also

noted, however, that "Rule 23 contains no suggestion that the necessity for individual damage

determinations destroys commonality, typicality, or predominance, or otherwise forecloses class

certification," and that the rule in fact "explicitly envisions class actions with such individualized

damage determinations." *Gunnells*, 348 F.3d at 427–28 (citing Fed. R. Civ. P. 23 advisory

committee's note to 1966 Amendment, subdivision (c)(4)). At issue, therefore, is what must be

true for individualized damage assessments to undermine certification in the manner that

*Comcast Corp.* described.

Defendants first note that determining damages for each prospective class member here

would require considering whether the customer was buying electricity or natural gas, the utility

service area in which the customer lives, the time period in which the customer was purchasing

energy, whether the customer received a promotional introductory rate, and the amount of energy

purchased each month. ECF No. 167 at 29. Those considerations do not present an obstacle to

certification. As Plaintiffs' expert Dr. Felder explains in a declaration, Defendants have produced

pricing data showing the exact rates XOOM charged variable rate customers for electricity and

natural gas between January 2012 and June 2018 and the corresponding rates charged in each

utility service area in each state. *See* ECF No. 162-10 ¶¶ 7–8. Dr. Felder states that the data

enables him to calculate for each month how much more XOOM customers were charged per

unit of energy compared to the charge had they remained with their local utility. *Id.* ¶ 8.

It is apparent that combining this pricing data with customer records that XOOM

presumably also has in its possession would allow for systematic determination of what each

prospective class member paid to XOOM as compared to what he or she would have paid if they

had not been induced to leave their local utility. Such individual calculations would not be

atypical in a class action. "Indeed, '[i]n actions for money damages under Rule 23(b)(3), courts usually require individual proof of the amount of damages each member incurred.'" *Gunnells*, 348 F.3d at 428 (alterations in original) (quoting 5 *Moore's Federal Practice* § 23.46[2][a] (1997)). "When such individualized inquiries are necessary, if 'common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied.'" *Id.* (quoting 5 *Moore's Federal Practice* § 23.46[2][a]).

But common questions do not predominate over individual questions as to liability in this case, a conclusion strengthened by reviewing the relationship between Plaintiffs' claims and the damages to which proving them would entitle class members. In short, because Plaintiffs have not advanced a legal theory entitling them to damages based merely on XOOM's purportedly excessive rates, calculating the amount of damages to which each class member is entitled is not simply a matter of comparing what a customer paid to a XOOM subsidiary with what they would have paid to their local utility. Under the claims Plaintiffs have raised, Defendants' liability to a given prospective class member turns on whether the customer justifiably relied on variant representations by IBOs.[12] Accordingly, assuming a class member's reliance was justifiable, the appropriate amount of damages appears to depend on the misrepresentation about savings on which the customer relied.

To the extent that the relationship between specific misrepresentations and attendant harm is unclear, Plaintiffs' own expert has dispelled any ambiguity by stating that he would employ that precise reasoning in calculating damages. Dr. Felder specifically testified that the amount of damages to which a customer is entitled "depends on what commitment was made by

---

[12] Defendants have not addressed the impact of this issue on NJCFA claims, which as described previously do not require a showing of reliance. Nonetheless, even if NJCFA claims do not present the same damages-related predominance issue as the remaining claims, the individualized causation inquiry needed to prove liability under the statute still undermines the "suitability . . . for class treatment" of such claims. *Donachy*, 2012 WL 869007, at *10.

XOOM and its affiliates to customers." ECF No. 167-7 at 7. For example, Dr. Felder testified

that if a customer was promised a five percent savings with XOOM, but in actuality saved only

two percent, "then what they should have saved, but didn't, would be the overcharges." *Id.*

Asked more generally about this relationship, Dr. Felder testified that to calculate a customer's

damages, he would "absolutely" need to know "what was committed to between the customer

and XOOM, or XOOM and its affiliates" because "[y]ou have to have a point of comparison."

*Id.* at 11.[13] When asked how he would determine the "overcharge" for a customer who was

promised "5 or 10 percent" savings, Dr. Felder testified that "it would be reasonable to assume

the customer could expect 10 percent, but it would depend" on "[t]he exact statement and the

context of that." *Id.* at 8. In short, Plaintiffs' expert has confirmed that simply calculating

damages based on the difference between what XOOM charged in a given service area in a given

month and what the utility would have charged – which might be feasible on a class-wide basis –

is not sufficient here. Individualized damages inquiries are inevitable.

Plaintiffs' arguments in response elide or misperceive this essential distinction. Plaintiffs

insist that because the pricing data Defendants produced "shows the exact rate charged to Class

members in a given market," and because "every Class member in the same market was charged

at the exact same rate, every Class member can be shown to have been overcharged." ECF No.

173 at 18. This analysis appears to again rely on the mistaken assumption that every customer is

entitled to the difference between what they paid to XOOM and what they would have paid their

local utility. *Id.* at 19. But as confirmed by Dr. Felder, the amount each customer was charged in

excess of their utility is not the appropriate measure of damages when Plaintiffs' claims rely on

---

[13] Notably, when asked how he would calculate damages for a customer who was simply told that "her bill would be a lot cheaper" if she switched from her local utility to a XOOM subsidiary, Dr. Felder struggled to offer a specific answer. *See* ECF No. 167-7 at 9–10.

variant and often vague promises of savings. Because Plaintiffs' claims, even if proven, would not entitle prospective class members to damages based merely on XOOM's rates, individualized damages assessments are required, undermining the predominance requirement.

Defendants finally assert that the availability of punitive damages differs across the states making up the Class. ECF No. 167 at 17, 31. Plaintiffs have not addressed this issue in their briefing, but Defendants are correct that the law concerning punitive damages differs meaningfully across states and that courts have considered that variation as a factor in rejecting certification. *See In re Stucco Litig.*, 175 F.R.D. 210, 216 (E.D.N.C. 1997) (noting that "[s]tate punitive damages law varies not only in terms of the conduct required to obtain punitives . . . but also in terms of the burden of proof required" and concluding that "[a]ny instructions attempting to account for these variations would surely baffle a jury"); *see also Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 627 (D. Kan. 2008) (explaining that "different states have different threshold standards for awarding punitive damages, including different standards of intent and standards of proof, not to mention widely varying limitations on recoverable amounts"); *Ziemkiewicz v. R+L Carriers, Inc.*, 996 F. Supp. 2d 378, 403 (D. Md. 2014) (noting conflicts in the punitive damages laws of Maryland, New Jersey, and Ohio). Divergence in the availability and magnitude of punitive damages is thus a final factor weighing against predominance and certification of the proposed Class and subclasses.[14]

To be clear, the Court has not overlooked Plaintiffs' insistence that denying certification "would lead to an unmanageable series of cases and would prevent the vast majority of Xoom customers from pursuing their claims at all." ECF No. 173 at 17. But whatever the accuracy of

---

[14] Defendants also argue that rules for calculating compensatory damages in fraud cases vary meaningfully between states. ECF No. 167 at 16, 31 (citing *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 578 (S.D.N.Y. 2018)). However, given that Plaintiffs' expert has endorsed a specific damages methodology that already undermines predominance, the Court sees no need to embark on a review of an additional damages-related issue.

that assertion, it cannot make up for Plaintiffs' inability to satisfy requirements for class

certification imposed by Rule 23 and the case law that has interpreted it. Because Plaintiffs have

failed to demonstrate that "questions of law or fact common to class members predominate over

any questions affecting only individual members," and because of the additional issues the Court

has addressed with respect to typicality and adequacy, the Court will decline to certify Plaintiffs'

proposed Class and subclasses. Fed. R. Civ. P. 23(b)(3).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Motion for Class Certification and

Appointment of Class Counsel, ECF No. 161, will be denied. A separate Order shall issue.


Date: <u>August 18, 2020</u>                                         <u>  /s/                                           </u>
                                                                    GEORGE J. HAZEL
                                                                    United States District Judge